172.    Accordingly, Petitioner Barhoumi is entitled to a writ of habeas corpus and to necessarily related declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### THIRTEENTH CLAIM FOR RELIEF
### (VIOLATION OF THE APA AND THE MILITARY ORDER: TORTURE AND CRUEL, INHUMANE OR DEGRADING TREATMENT)

173.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

174.    By the actions described above, the Respondents have acted and continue to act arbitrarily and capriciously by directing, ordering, confirming, ratifying, and/or conspiring to unlawfully subject Petitioner Barhoumi to torture and/or cruel, inhumane or degrading treatment in violation of Army Regulation 190-8 and the Administrative Procedures Act, 5 U.S.C. § 706(2).

175.    These unlawful acts of Respondents violate the Military Order, as they constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

176.    Accordingly, Petitioner Barhoumi is entitled to a writ of habeas corpus and to necessarily related declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### FOURTEENTH CLAIM FOR RELIEF
### (VIOLATION OF THE RIGHT TO COUNSEL AND ACCESS TO THE COURTS)

177.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

178.    Respondents, purportedly acting from a concern for national security, consistently have contrived to intrude upon Petitioner Barhoumi's right to consult with

counsel by conditioning counsel's access to Petitioner on unreasonable terms, including classification/declassification procedures, all in violation of Petitioner Barhoumi's attorney-client privilege, his work product privilege, and the Fifth and Sixth Amendments to the U.S. Constitution.

179.    Accordingly, Petitioner Barhoumi is entitled to a writ of habeas corpus and to necessarily related declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### FIFTEENTH CLAIM FOR RELIEF
### (DUE PROCESS CLAUSE AND THE MILITARY ORDER:
### RENDITION OR THE THREAT THEREOF (INHUMANE TREATMENT))

180.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

181.    Upon information and belief, Petitioner Barhoumi is at risk of being rendered, expelled or returned without lawful procedures to a country that engages in torture and being threatened with same. The transfer of the Petitioner (or threat of same) to a country where there is a foreseeable and direct risk that he will be subjected to torture constitutes a violation of Petitioner's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

182.    These unlawful acts of Respondents violate the Military Order, as they constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

183.    Accordingly, Petitioner Barhoumi is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

## SIXTEENTH CLAIM FOR RELIEF
### (CONVENTION AGAINST TORTURE AND
### CONVENTION RELATING TO THE STATUS OF REFUGEES AND THE MILITARY ORDER:
### RENDITION (INHUMANE TREATMENT))

184.    Petitioners incorporate by reference all preceding paragraphs as set forth fully herein.

185.    Upon information and belief, Petitioner is at risk of being rendered, expelled or returned without lawful procedures to a country that engages in torture. The transfer of the Petitioner to a country that creates a foreseeable and direct risk that he will be subjected to torture constitutes a direct violation of Petitioner's rights under the Convention Against Torture and the 1954 Convention Relating to the Status of Refugees, 19 U.S.T. 6259, 189 U.N.T.S. 150 *entered into force* Apr. 22, 1954.

186.    Such rendition would violate the Military Order, as it would constitute illegal and inhumane treatment in violation of Section 3(b) of that order and would otherwise be illegal and *ultra vires.*

187.    Accordingly, Petitioner Barhoumi is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

## SEVENTEENTH CLAIM FOR RELIEF
### (ALIEN TORT STATUTE AND THE MILITARY ORDER:
### RENDITION (INHUMANE TREATMENT))

188.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

189.    Upon information and belief, Petitioner is at risk of being rendered, expelled or returned without lawful procedures to a country that engages in torture. The transfer of the Petitioner to a country that creates a foreseeable and direct risk that

he will be subjected to torture constitutes a violation of Petitioner's rights under customary international law, which may be vindicated under the Alien Tort Statute.

190.    Such unlawful acts of Respondents would violate the Military Order, as they would constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

191.    Accordingly, Petitioner Barhoumi is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### EIGHTEENTH CLAIM FOR RELIEF
(RESPONDENTS MAY NOT DETAIN BARHOUMI FOR TRIAL BEFORE AN INVALIDLY CONSTITUTED MILITARY COMMISSION)

192.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

193.    The Commission in this case is invalid and improperly constituted, and the grant of subject matter jurisdiction to the Commission is overbroad and unlawful for at least the following reasons:

A.    **The Commission lacks jurisdiction because the President lacked congressional authorization to establish the Commission**

194.    The Supreme Court has noted that "[w]hen the President acts in absence of . . . a congressional grant . . . of authority, he can only rely upon his own independent powers." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 72 S. Ct. 863, 872 (1952) (Jackson, J. concurring). *See also Hamdi v. Rumsfeld*, 542 U.S. ___, 124 S. Ct. 2633, 2650 (2004). The Constitution expressly grants Congress the sole power to create military commissions and define offenses to be tried by them. The Constitution vests Congress, not the Executive, with "All legislative powers," with the power "[t]o

44

define and punish offences against the Law of Nations" and "[t]o constitute Tribunals inferior to the Supreme Court." U.S. Const., Art. I § 8, cl. 9, cl. 10.

195.    Congress has not authorized the establishment of military commissions to try individuals captured during the Afghanistan war.  Accordingly, Respondents' detention of Barhoumi for trial by the Commission is improper, unlawful and invalid as an *ultra vires* exercise of authority.  It exceeds the President's powers under Article II and thus violates the constitutional principles of separation of powers.

196.    Barhoumi's status as an Algerian citizen does not confer unlimited power on Respondents to operate outside of the Constitutional framework.  The Supreme Court's assertion of jurisdiction for the federal courts in *Rasul* establishes indisputably that aliens held at the base in Guantanamo Bay, no less than American citizens, are entitled to invoke the federal courts' authority under 28 U.S.C. § 2241.  *Rasul,* 542 U.S. at ___, 124 S. Ct. at 2696 ("[c]onsidering that the statute draws no distinction between Americans and aliens held in federal custody, there is little reason to think that Congress intended the geographical coverage of the statute to vary depending on the detainee's citizenship") (footnote omitted).  Thus, both Congress and the judiciary possess constitutional authority to check and balance the power of the Executive to act unilaterally.  *Rasul*, 542 U.S. at ___, 124 S. Ct. at 2700 (Kennedy, J., concurring).

**B.    The Appointing Authority lacks power to exercise military authority to appoint a military commission.**

197.    Because there is no statute expressly stating who can appoint members of a Commission, the power to appoint members of a military commission is based upon the power to convene a general courts-martial.  Only the Executive, the Secretary of

45

Defense (or Secretaries of the other branches of the armed forces) or a commanding officer to whom the Secretary has delegated authority may convene a general court-martial.[7]

198.    In this case, the Respondent Secretary Rumsfeld purportedly has delegated authority to Respondent Altenburg to appoint the members of military commissions.

199.    Respondent Altenburg is a civilian, not a commissioned officer, and thus lacks the power to exercise military jurisdiction in any form.

200.    As a result, the Commission by which the Respondents intend to try Barhoumi is improperly constituted and invalid, such that Barhoumi is entitled to a writ of habeas corpus preventing his unlawful detention and trial before that improper tribunal.

**C.    The Commission lacks jurisdiction to try individuals at Guantanamo Bay.**

201.    Military commissions have no jurisdiction to try individuals far from the "locality of actual war." *See Milligan*, 71 U.S. at 127.

202.    The Commission that will try Barhoumi is situated far outside any zone of conflict or occupation, and Barhoumi's alleged conduct on which the charges are based did not occur at Guantanamo Bay. As such, the Commission lacks authority to try Barhoumi, and therefore, the Respondents lack the authority to continue to detain Barhoumi for any purported trial at Guantanamo Bay.

---

[7]    *See* 10 U.S.C. §822.

### NINETEENTH CLAIM FOR RELIEF
#### (RESPONDENTS MAY NOT DETAIN BARHOUMI FOR OFFENSES THAT HAVE BEEN CREATED BY THE PRESIDENT AFTER THE FACT)

203.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

204.    Respondent President Bush is attempting to try Barhoumi for crimes that he created long after the alleged "offenses" were committed.

205.    The offense of conspiracy stated in the charges against Barhoumi, did not previously exist as an offense.  This "offense" was essentially created by the PMO, MCO No. 1, and Military Commission Instruction No. 2, well after Barhoumi's alleged conduct.  In essence, the government alleges that Hicks is *criminally* liable for allegedly participating in combat against the United States and its allies.  That has never been a criminal offense.

### A.    The Executive cannot define crimes.

206.    Congress, not the Executive, has the authority to legislate under Article I of the Constitution.  This expressly includes the power "[t]o define and punish . . . Offences against the Law of Nations."  Absent Congressional authorization, the Executive lacks the power to define specific offenses.  If he attempts to do so, as he has done here, his actions are *ultra vires* and violate the principles of separation of powers.  Accordingly, Barhoumi may not be detained for trial on newly-created offenses established and defined solely by the President.

### B.    Crimes cannot be defined after the fact.

207.    In addition, any charges instituted by the Commission must constitute offenses under the law of war as it existed at the time the alleged conduct was

committed. Applying laws created after the conduct (such as the definition of offenses set forth in MCO No. 2 and the charge of conspiracy which has been made in the Charge against Barhoumi) would violate the *ex post facto* clause of the Constitution (Art. 1, §9, cl. 3) and the principle that a person must have reasonable notice of the bounds of an offense. (Offenses defined to criminalize the conduct of a single person or group of people -- such as those in MCO No. 2 also violate the Constitutional prohibition on bills of attainder.)

208.    Since the Charges do not allege any offenses against Barhoumi under the law of war as it existed at the time he allegedly committed these acts, Barhoumi cannot be detained as a result of these Charges. Accordingly, Barhoumi is entitled to a writ of habeas corpus, and Barhoumi should be released immediately.

### TWENTIETH CLAIM FOR RELIEF
### (RESPONDENTS MAY NOT DETAIN BARHOUMI FOR TRIAL ON CHARGES OUTSIDE THE JURISDICTION OF THE MILITARY COMMISSION)

209.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

210.    Barhoumi's confinement is unlawful because he is being detained to face charges before a Commission that is not empowered to hear and/or adjudicate the charges instituted against him. Barhoumi's continued detention purportedly to face trial on the charges leveled against him is unlawful because the charges are outside the parameters established by the Uniform Code of Military Justice (hereinafter "UCMJ"), 10 U.S.C. §801, *et seq.*, the statutory scheme that controls military detentions and that limits the offenses triable by military commissions (even in instances where Congress

has provided any jurisdiction to the military commissions, which it has not with respect to the conflict in Afghanistan).

211.    Under the UCMJ, military commissions may not hear and adjudicate any offenses other than those that are recognized by the traditional law of war or those that Congress has expressly authorized them to hear. Here, the offenses charged are not within either of these categories.

212.    The purported offense of conspiracy is not a valid offense triable by the Commission under recognized principles of the law of war, the UCMJ or any other statutory authorization. Because civil law countries do not recognize a crime of conspiracy, conspiracy has never been part of the laws of war. No international criminal convention has ever recognized conspiracy to violate the laws of war as a crime. This includes the Geneva Conventions, as well as those setting up the international criminal tribunals in Yugoslavia and Rwanda, as well as the international criminal court. Indeed, the government is making up charges that have been specifically rejected as violations of the laws of war -- including at Nuremburg, for example.

213.    As a plurality of the Supreme Court held in *Reid v. Covert*:

[t]he jurisdiction of military tribunals is a very limited and extraordinary jurisdiction derived from the cryptic language in Art. I, § 8 [granting Congress the power to "define and punish . . . Offences against the Law of Nations"], and, at most, was intended to be only a narrow exception to the normal and preferred method of trial in courts of law. Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts, and, more important, acts as a deprivation of the right to jury trial and of other treasured constitutional protections.

354 U.S. 1, 21, 77 S. Ct. 1222, 1233 (1957).

49

214.    Since the charges do not allege any offenses against Barhoumi under the law of war or express statutory authority, the Commission lacks jurisdiction to try and/or punish Barhoumi for those offenses.  Accordingly, Barhoumi is entitled to a writ of habeas corpus, and should be released immediately.

### TWENTY-FIRST CLAIM FOR RELIEF
### (THE MILITARY COMMISSION PROCEDURES VIOLATE BARHOUMI'S RIGHTS UNDER STATUTORY, CONSTITUTIONAL AND INTERNATIONAL LAW)

215.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

216.    Even if the Commission had jurisdiction, Barhoumi's detention to stand trial before the Commission still would be unlawful because the Commission's procedures violate applicable principles of statutory, constitutional, and international law.

217.    In a series of "Military Commission Orders" (the "MCOs"), issued on March 21, 2002, Respondent Secretary Rumsfeld prescribed the procedural rules of these special military commissions.  If Barhoumi is tried according to these proposed procedures, he will receive less protection than he is entitled to under American law, the Constitution, and international law and treaties.  The procedures set forth by the MCOs provide Barhoumi with far less protection than those set forth in the UCMJ.  The MCOs violate Barhoumi's rights to certain basic procedural safeguards.  The MCOs fail to provide Barhoumi an impartial tribunal to adjudicate the charges against him or review those charges.  Barhoumi's accusers effectively appoint the "judge and jury" and then review their decision.  And during these proceedings themselves, his accusers can

introduce unreliable evidence of the worst sort -- unsworn allegations derived from coerced confessions with no right of confrontation.

218.   The absence of procedural protections makes the Commission inadequate as a matter of law.

### A.     The UCMJ

219.   Barhoumi is entitled to the protections of the basic trial rights set forth by Congress in the UCMJ.  By its own terms, the UCMJ applies to all persons, including Barhoumi, who are detained within the territory or leased properties of the United States.  And the UCMJ prohibits biased tribunals and the use of unreliable evidence of the sort the commissions intend to permit.

### B.     The Geneva Convention

220.   The Geneva Convention requires that prisoners of war ("POW"s), as defined by the Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, be treated with the same procedural protections as the soldiers of the country detaining them.[8]  Under Article 5 of the Geneva Convention (III) ("Article 5"), Barhoumi is entitled to be treated as a POW until a competent tribunal has determined otherwise.[9]  As a result, he is entitled to the procedural protections that would apply in a court martial.

221.   Even if Barhoumi were not a prisoner of war, any proceeding would still have to meet the requirements of Common Article III of the Geneva Convention and

---

[8]     Geneva Convention (III) Relative to the Treatment of Prisoners of War: August 12, 1949, 75 U.N.T.S. 135, *entered into force* Oct. 21, 1950.  The Geneva Convention has also been codified in the UCMJ.

[9]     *See id.* at Art. 5.

Article 75 of Protocol I to the Geneva Conventions. These provide that conviction can only be pronounced by an impartial court respecting generally recognized principles of judicial procedure. Article 75 of Protocol I to the Geneva Conventions specifically provides that no one can be compelled to confess guilt. Barhoumi's long period of interrogations certainly defies the requirements of Article 75. These requirements are not met by the Commission.

### C.    The Due Process Clause

222.    The Constitution's guarantee of due process also guarantees Barhoumi the basic trial rights he will be denied before the Commission. A trial without these basic procedural safeguards lacks the fundamental fairness required in any judicial proceedings -- especially in criminal proceedings that can result in life imprisonment.

223.    Since the Commission procedures violate statutory, constitutional, and international law, and in so doing, fail to provide Barhoumi with the basic safeguards necessary to constitute a fundamentally fair criminal proceedings, Barhoumi is entitled to a writ of habeas corpus holding these proceedings to be illegitimate, and should be released immediately.

### TWENTY-SECOND CLAIM FOR RELIEF
#### (TRIAL BEFORE THE MILITARY COMMISSION VIOLATES BARHOUMI'S RIGHT TO EQUAL PROTECTION OF THE LAWS OF THE UNITED STATES)

224.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

### A.    Barhoumi's detention violates the Equal Protection Clause.

225.    Barhoumi is being detained by Respondents under the claimed authority of the PMO and MCO No. 1. These Orders violate Barhoumi's right to equal protection of

the laws of the United States. Under the PMO and MCO No. 1, Barhoumi may be held for trial by the Commission only because of his alienage, since the Orders, by their terms, apply *only* to *non*-citizens. [10] Consequently, thus detention runs afoul of the very purpose of the Equal Protection Clause of the United States Constitution.

226.    The Supreme Court has held that any discrimination against aliens not involving governmental employees is subject to strict scrutiny. Here, the government cannot show a compelling governmental reason, advanced through the least restrictive means, for granting *citizens* access to the fundamental protections of civilian justice (including, *inter alia*, indictment, evidentiary rules ensuring reliability and fairness, a system consistent with previously prescribed rules developed by the legislature and enforced by impartial courts, a jury trial presided over by an independent judge not answerable to the prosecutor, and the right to an appeal before a tribunal independent of the prosecuting authority), but affording *non-citizens* a distinctly less protective and inferior brand of adjudication. While the government may have latitude in differentiating between citizens and aliens in areas such as immigration, it has no such latitude with respect to criminal prosecutions.

227.    Thus, the blatant and purposeful discriminatory nature and impact of MCO No. 1 violates the Equal Protection clause.

**B.    Barhoumi's detention violates 42 U.S.C. § 1981.**

---

[10]    Military Order of November 13, 2001 Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833, § 4 (November 13, 2001); Presidential Military Order, 66 Fed. Reg. 57,833 (Nov. 13, 2001) (attached as Exhibit 4).

228.    Barhoumi's detention for trial by the Commission also violates 42 U.S.C. § 1981.[11] That fundamental statutory provision guarantees equal rights for all persons to give evidence, to receive equal benefit of all laws and proceedings for the security of persons, and to receive like punishment.  Barhoumi is being unlawfully detained for purposes of trial by the Commission solely because he is a non-citizen.  A citizen who committed the very same acts as Barhoumi could not be detained under the PMO and held for trial before the Commission.  Accordingly, Barhoumi's detention for trial by the Commission on that discriminatory basis is unlawful.

229.    Respondents have detained Barhoumi for trial before the Commission in violation of equal protection of the laws of the United States.

230.    Accordingly, Barhoumi is entitled to a writ of habeas corpus, a determination that the Commission proceedings against him are unlawful, and he should be released immediately.

**TWENTY-THIRD CLAIM FOR RELIEF**
**(RESPONDENTS FAIL TO JUSTIFY HOLDING BARHOUMI AS AN ENEMY COMBATANT)**

231.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

232.    Just as the government has no authority to detain Barhoumi for his alleged violations under a nonexistent version of the law of war, the government has no

---

[11]    42 U.S.C. §1981(a) states in its entirety:

[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

authority to detain Barhoumi as an enemy combatant.   Respondents' actions to date in detaining Barhoumi constitute a violation of the process accorded persons seized by the military in times of armed conflict as defined by Geneva Conventions III and IV and customary international law, as well as being inconsistent with the provisions set forth below.

A.    **Under *Hamdi*, the Due Process Clause requires a neutral tribunal with significant procedural protections to determine whether Barhoumi is an enemy combatant.**

233.   No tribunal has determined that Barhoumi is an enemy combatant.

234.   The CSRT process and procedures that have now been established -- although not yet employed with respect to Barhoumi -- violate due process at least with respect to:  (1) the failure to adhere to an appropriate standard of proof; (2) the granting of an appeal to the government of a determination favorable to the detainee; (3) the failure to make an appropriate status determination by limiting the inquiry to consideration only of "enemy combatant" status; (4) the denial of a detainee's right to counsel or other appropriate representation; (5) the denial of a public hearing; (6) the government's power to arbitrarily rescind or change the CSRT process and procedures; and (7) the failure to constitute the CSRT in a manner to assure a neutral decision maker.

B.    **The Geneva Convention and army regulations require a determination by a fair tribunal.**

235.   Under Article 5 of the Geneva Convention, Barhoumi is entitled to a "competent tribunal" to determine whether he can be held as an enemy combatant.[12] The same procedural deficiencies that render the CSRT proceedings inadequate for purposes of due process also render the CSRT deficient as a competent tribunal.  Army Regulations 190-8 and the Administrative Procedures Act also show these procedures are unlawful as, for example, the burden of proof is not consistent with that established in the regulations.

236.   Moreover, it is now too late to establish a competent tribunal.  Article 5 of Geneva Convention III, provides that "should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy belong to any of the categories enumerated in [Article 4 of the Geneva Convention (III), defining the different categories of belligerents,] such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal."[13]

---

[12]   *See id.* at Art. 5.

[13]   *Id.* at Art. 5.  Geneva Convention (III) revised the Geneva Convention relative to the Treatment of Prisoner of War of July 27, 1929, which followed the 18 October 1907 Hague Conventions [Relative to the Opening of Hostilities (III), Respecting the Laws and Customs of War on Land and its annex: Regulation concerning the Laws and Customs of War on Land (IV), and Respecting the Rights and Duties of Neutral Powers and Persons in Case of War on Land (V)] , and was enacted concurrent with the Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces In the Field, Geneva, 12 August 1949 ["Geneva Convention (I)"], the Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Geneva, 12 August 1949 ["Geneva Convention (II)"], Convention relative to the Protection of Civilian Persons in Time of War, Geneva, 12 August 1949 ["Geneva Convention (IV)"].  Subsequently, two Protocols Additional to the Geneva Conventions of 12 August 1949, relating to the Protection of Victims of International Armed Conflicts ("Protocol I"), 8 June 1977, and relating to the Protection of Victims of Non-International. Armed Conflicts ("Protocol II"), 8 June 1977.

237.    Respondents have unlawfully detained Barhoumi in violation of their

obligation to treat Barhoumi presumptively as a POW, as required by Article 5, and in

violation of the procedural requirements of the Third and Fourth Geneva Conventions

and customary international law more generally.  Thus, the government's failure to

accord Petitioner Barhoumi the protections of Article 5 violates the provisions of

Geneva Convention (III) as well as the U.S. military regulations promulgated to

implement them.[14]

---

[14]     In addition, in *Hamdi*, Justice Souter, in his concurring and dissenting opinion (joined by Judge Ginsburg), pointed out that under Respondents' stated position, "the Geneva Convention applies to the Taliban detainees[,]" Office of the White House Press Secretary, Fact Sheet, Status of Detainees at Guantanamo (Feb. 7, 2002), www.whitehouse.gov/news/releases/2002/ 02/20020207-13.html (available in Clerk of Court's case file) (hereinafter White House Press Release) (cited in Brief for Respondents 24, n. 9)[,] Hamdi is such a detainee according to the Government's own account, because, under that account, he was taken bearing arms on the Taliban side of a field of battle in Afghanistan.  He would therefore seem to qualify for treatment as a prisoner of war under the Third Geneva Convention, to which the United States is a party.  Article 4 of the Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, [1955] 6 U.S. T. 3316, 3320, T. I. A. S. No. 3364." 542 U.S. at ___, 124 S. Ct. at 2657 (Souter, J., *concurring in part and dissenting in part, and concurring in the judgment*).[14]
    While ultimately noting that "[w]hether, or to what degree, the Government is in fact violating the Geneva Convention and is thus acting outside the customary usages of war are not matters I can resolve at this point[,]" 542 U.S. at ___, 124 S. Ct. at 2658-59, Justice Souter (and Justice Ginsberg) nevertheless stated that "[f]or now it is enough to recognize that the Government's stated legal position in its campaign against the Taliban (among whom Hamdi was allegedly captured) is apparently at odds with its claim here to be acting in accordance with customary law of war and hence to be within the terms of the Force Resolution in its detention of Hamdi." 542 U.S. at ___, 124 S. Ct. at 2657 (Souter, J., *concurring in part and dissenting in part, and concurring in the judgment*).  Justice Souter also expressed his concern that

> [b]y holding [Mr. Hamdi] incommunicado, however, the Government obviously has not been treating him as a prisoner of war, and in fact the Government claims that no Taliban detainee is entitled to prisoner of war status.  See Brief for Respondents 24;  White House Press Release. This treatment appears to be a violation of the Geneva Convention provision that even in cases of doubt, captives are entitled to be treated as prisoners of war "until such time as their status has been determined by a competent tribunal." Art. 5, 6 U.S. T., at 3324.

542 U.S. at ___, 124 S. Ct. at 2657 (Souter, J., *concurring in part and dissenting in part, and concurring in the judgment*).  *See also id.* [noting that government's position is "apparently at odds with the [applicable] military regulation," Army Reg. 190-8, §§ 1-5, 1-6 (1997)].

238.    Respondents have deliberately contravened the requirement that Barhoumi's status be determined in order to subject Barhoumi to improper and illegal interrogation techniques that violate not only Geneva Convention (III), but also the United States Constitution (Fifth and Sixth Amendments), treaties to which the U.S. is a signatory, and international and common law.

**C.    The government cannot continue to hold Barhoumi as an enemy combatant because it has not shown that he is one.**

239.    The government has not come forward with any proof of Barhoumi's combatant status.  Under the Constitution, the Geneva Conventions, the International Covenant on Civil and Political Rights, and the American Declaration on the Rights and Duties of Man, Barhoumi cannot be held arbitrarily.  Barhoumi is entitled to a judicial determination of his status.  In order to hold Barhoumi as an enemy combatant, the government must demonstrate that he is an enemy combatant.  If it does this, it still must accord him prisoner of war status.  And absent a showing that Barhoumi is an enemy combatant, Barhoumi is entitled to release.

**D.    The government cannot continue to hold Hicks under its own regulations**

240.    Indeed, even under the Army's own Regulations 190-8 at 1-6(g), "Persons who have been determined not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed."[15]

---

[15]    *See* Army Regulation 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, § . 1-6(g), (1997).

241.   By arbitrarily and capriciously detaining Petitioner in custody for over two and a half years while claiming he is not entitled to prisoner of war status, Respondents have acted and continue to act *ultra vires* and in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).  Under the Army's own regulations, Petitioner cannot be held unless he has committed specific acts under which he can be punished.  But as we have seen in the Counts on the Commission, the government has not charged Petitioner with any acts that could form a basis to hold him.

**E.    Under the Alien Tort Claims Act, Respondents Cannot Continue to Detain Petitioner Barhoumi.**

242.   By arbitrarily holding Petitioner without any justification for doing so and subjecting him to cruel, inhuman or degrading treatment, including torture, Respondents have acted in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350 in that the acts violated customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

**F.    The government cannot continue to hold Hicks as an enemy combatant once hostilities have ended.**

243.   Under Article 118 of Geneva Convention (III), "[p]risoners of war shall be released and repatriated without delay after the cessation of active hostilities." *See also Hamdi*, 542 U.S. at ___, 124 S. Ct. at 2640-41.  Respondents and their agents have acknowledged that hostilities in Afghanistan have ceased or will soon cease (even if they were ongoing to some extent until shortly before the Supreme Court's decision in *Hamdi*).  Indeed, the Chairman of the Joint Chiefs of Staff recently commented with respect to security in Afghanistan, "Security-wise, the *al Qaeda* threat is virtually

59

nonexistent in the country."[16]  Similarly, Respondent Secretary Rumsfeld, in a joint

May 1, 2003 press conference with Afghan President Hamid Karzai in Washington,

announced that "we're at a point where we clearly have moved from major combat

activity to a period of stability and stabilization and reconstruction activities.  The bulk

of this country today is permissive, it's secure."[17]

244.    Barhoumi is presumptively a POW entitled to all protections afforded by

Geneva Convention (III), including, under Article 118, release after hostilities have

ceased.

245.    Barhoumi also is entitled to the protection of Common Article 3 of

Geneva Convention (III).  Article 3(1)(d) prohibits the contracting parties from

"passing. . . sentences . . . without previous judgment pronounced by a regularly

constituted court, affording all the judicial guarantees which are recognized as

indispensable by civilized peoples."

246.    In this case, the prolonged confinement of Barhoumi without charge, and

without process to contest his guilt or challenge his detention, amounts to an arbitrary

and illegally imposed sentence that is incompatible with fundamental guarantees of due

process recognized by all civilized people, in violation of Article 3 of the Geneva

Convention (III), and in violation of the due process clause of the Fifth Amendment.

Further, Respondents' confinement of Barhoumi is a form of punishment in violation of

---

[16]     *See* Armed Forces Information Service, *Joint Chiefs Chairman Notes Improvement In Afghanistan* (Aug. 16, 2004), *at* www.defenselink.mil/news/Aug2004/n08112004_2004081207.html.

[17]     *See CNN Rumsfeld:  Major combat over in Afghanistan* (May 1, 2003) *at* http://www.cnn.com/2003/WORLD/asiapcf/central/05/01/afghan.combat; *See also* Armed Forces Information Service, *News Articles,* (May 1, 2003) *at* http://www.defenselink.mil/news/May2003/n05012003_200305016.html.

the 8th Amendment to the Constitution.  Accordingly, Barhoumi is entitled to a writ of habeas corpus and should be released immediately.

**TWENTY-FOURTH CLAIM FOR RELIEF**
**(RESPONDENTS HAVE DENIED BARHOUMI THE RIGHT TO A SPEEDY TRIAL AND THE RIGHT TO BE FREE FROM UNREASONABLE PRE-TRIAL CONFINEMENT)**

247.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

### A.    Barhoumi was entitled to a speedy trial under the UCMJ.

248.    The PMO, pursuant to which Barhoumi has been detained for trial, purports to be based, in part, on congressional authorization embodied in selected provisions of the UCMJ.  In promulgating the PMO, Respondent President Bush relied, in part, on his authority under 10 U.S.C. §836, which allows the Executive to prescribe rules for military commissions so long as they are not inconsistent with the UCMJ.

249.    However, the PMO, and its implementation through MCO No. 1, clearly contravene Article 10 of the UCMJ, 10 U.S.C. §810, which provides that any arrest or confinement of an accused must be terminated unless charges are instituted promptly and made known to the accused, and speedy trial afforded for a determination of guilt on such charges:

> [w]hen any person subject to this chapter is placed in arrest or confinement prior to trial, immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or dismiss the charges and release him.

10 U.S.C. § 810.

250.    Barhoumi is a person subject to the UCMJ by virtue of Respondent President Bush's PMO and MCO No. 1, as well as by virtue of Article 2 of the UCMJ, 10 U.S.C. § 802(a)(12), which provides that "persons within an area leased by or

61

otherwise reserved or acquired for the use of the United States" and under the control of any of the various branches of the military are subject to the UCMJ. Under the Supreme Court's decision in *Rasul*, 542 U.S. at ___, 124 S. Ct. at 2696-98, Guantanamo Bay qualifies under both prongs.

251.    The type of delays to which Barhoumi has been subjected are intolerable in the absence of extraordinary or compelling circumstances. Here, the Respondents have not provided any reason whatsoever for their inordinate delays in charging Barhoumi. Since Respondents did not take "immediate steps . . . to inform" Barhoumi "of the specific wrong of which he is accused," they now have a clear and nondiscretionary duty under the UCMJ to "release him" from his confinement.

**B.    Barhoumi was entitled to a speedy trial under the Geneva Convention.**

252.    Barhoumi's lengthy pre-trial confinement violates Article 103 of Geneva Convention (III), as well as United States government regulations. Article 103 of Geneva Convention (III) provides that:

> [j]udicial investigations relating to a prisoner of war shall be conducted as rapidly as circumstances permit and so that his trial shall take place as soon as possible. A prisoner of war shall not be confined while awaiting trial unless a member of the armed forces of the Detaining Power would be so confined if he were accused of a similar offence, or if it is essential to do so in the interests of national security. *In no circumstances shall this confinement exceed three months.*

6 U.S.T. 3316, 3394, 75 U.N.T.S. 135 (emphasis added).

253.    In addition, Article 5 of Geneva Convention (III) declares that:

> should any doubt arise as to whether persons . . . belong to any of the categories [entitled to protection as a P.O.W. under the Convention], such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

254.    Likewise, §1-6(a) U.S Army Regulation 190-8, entitled Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, requires that United States military forces abide by the provisions of Article 5 of Geneva Convention (III).    Similarly, the Commander's Handbook on the Law of Naval Operations states that "individuals captured as spies or as illegal combatants have the right to assert their claim of entitlement to prisoner-of-war status before a judicial tribunal and to have the question adjudicated."    Department of the Navy, NWP 1-14M, The Commander's Handbook on the Law of Naval Operations 11.7 (1995).

255.    Respondents are under a clear nondiscretionary duty under Geneva Convention (III), and under the U.S. Army's (and Navy's) own regulations to release Barhoumi because he has been detained in segregation for more than three months – indeed, for several years, substantially longer than the permissible period.

256.    Even if Barhoumi were not a presumptive POW, the Geneva Convention would not sanction such delay.    The Geneva Convention requires that all civilians and protected persons must be "promptly informed" of the charges and brought to trial "as rapidly as possible."    Geneva Convention IV, art. 7.    Similarly the fundamental guarantees of Protocol I require that Barhoumi be "informed without delay" of the particulars of charges, and incorporate the International Covenant on Civil and Political Rights.

**C.    Barhoumi was entitled to a speedy trial under the Sixth Amendment.**

257.    Moreover, the Sixth Amendment to the United States Constitution requires that in all criminal prosecutions, "the accused shall enjoy the right to a speedy . . .

trial." U.S. Const. amend. VI. Respondents' unlawful detention violates Barhoumi's

right to a speedy trial.

258.    Respondents have denied Barhoumi his right to a speedy trial as required

by American law, the Constitution, and international law and treaty, and Barhoumi

therefore is entitled to a writ of habeas corpus and immediate release.

### TWENTY-FIFTH CLAIM FOR RELIEF
#### (THE ABUSE, MISTREATMENT AND RELATED INTERROGATIONS OF BARHOUMI CONSTITUTES SHOCKING AND OFFENSIVE GOVERNMENT CONDUCT DENYING HIM DUE PROCESS)

259.    Petitioner incorporates by reference all preceding paragraphs as if set

forth fully herein.

260.    The charges asserted against Barhoumi cannot properly justify his

detention because they are based on unlawfully obtained statements from Barhoumi and

other detainees (at Guantanamo Bay and elsewhere). *See* Composite Statement

(attached hereto as Exhibit 3). Those statements have been procured via coercive and

"aggressive" interrogation techniques and environment that not only violate Barhoumi's

Fifth Amendment right to remain silent, his Sixth Amendment right to counsel (with

respect to his own statements), and his Eighth Amendment right to be free from cruel

and unusual punishment, but also "shock the conscience" and thereby violate

Barhoumi's Fifth Amendment Due Process rights (with respect to his own statements as

well as those of other detainees). Those techniques also violate Barhoumi's rights under

Geneva Convention (III), the CAT, the UCMJ, the ATCA (which prohibits both torture

and cruel, inhuman and degrading treatment), Army Regulation 190-8 and the APA, and

customary international law. The illegitimacy of basing Barhoumi's prosecution by the

Commission upon statements obtained through coercive interrogation arises not only

from the volume and degree of abuse, but also from the fact that statements obtained via

coercion and a naked reward/punishment system are simply not reliable[18] – and

certainly not sufficiently so to find Barhoumi guilty beyond a reasonable doubt, and

imprison him as a result.  Article 99 of the Geneva Convention (III) specifically

provides that "[n]o moral or physical coercion may be exerted on a prisoner of war in

order to induce him to admit himself guilty of the act of which he is accused."[19]  A

process that permits such unlawful extraction and use of improperly obtained statements

to form the basis of charges or at trial cannot stand.  *See, e.g., United States v. Russell*,

411 U.S. 423, 431-32 (1973) (acknowledging that there could exist "a situation in which

the conduct of law enforcement agents is so outrageous that due process principles

would absolutely bar the government from invoking judicial processes to obtain a

---

[18]     Dissenting in *Padilla*, Justice Stevens cautioned:

> [Executive detention] may not, however, be justified by the naked interest in using
> unlawful procedures to extract information.  Incommunicado detention for months on
> end is such a procedure.  Whether the information so procured is more or less reliable
> than that acquired by more extreme forms of torture is of no consequence.  For if this
> Nation is to remain true to the ideals symbolized by its flag, it must not wield the tools
> of tyrants even to resist an assault by the forces of tyranny.

542 U.S. at ___, 124 S. Ct. at 2735 (Stevens, J., *dissenting*).

[19]     The National Commission on Terrorist Attacks Upon the United States, 108th Cong., The 9/11
Commission Report 380 (Gov't. Printing Office 2004), *at* http://www.9-11
commission.gov/report/911/Report.pdf (hereinafter "the 9/11 Commission"), in its Final Report
published last month, recognized the importance of Geneva Convention (III) and international law in
the treatment of detainees.  In fact, the 9/11 Commission included among its recommendations that:

> [t]he United States should engage its friends to develop a common coalition approach
> toward the detention and humane treatment of captured terrorists.  New principles
> might draw upon Article 3 of the Geneva Conventions on the law of armed conflict.
> That article was specifically designed for those cases in which the usual laws of war
> did not apply.  Its minimum standards are generally accepted throughout the world as
> customary international law.

*Id.*

conviction"), *citing [cf.] Rochin v. California*, 342 U.S. 165 (152).  As a result, Barhoumi also is entitled to habeas relief on that basis.

261.    Since the abuse, mistreatment and related interrogations of Barhoumi constitutes such shocking and offensive government conduct, Barhoumi has been denied his right to due process.  Consequently, the only remedy capable of vindicating Barhoumi's rights is the grant of a writ of habeas corpus, dismissal of the Commission charges against Barhoumi, and an order requiring Barhoumi's release.

**SECTION V**
**PRAYER FOR RELIEF**

WHEREFORE, Petitioners pray for relief as follows:

1.    Designate Jamaal Kiyemba as Next Friend of Barhoumi;

2.    Grant the Writ of Habeas Corpus and order Respondents to release Petitioner Barhoumi from his current unlawful detention;

3.    Order that Petitioner Barhoumi be brought before the Court or before a Magistrate Judge assigned by the Court to conduct proceedings under the supervision of the Court to vindicate his rights;

4.    Order that Petitioner Barhoumi cannot be transferred to any other country without the specific written agreement of Petitioner and Petitioner's counsel while this action is pending;

5.    Order that Petitioner Barhoumi cannot be delivered, returned, or rendered to a country where there is a foreseeable and imminent risk that Petitioner will be subject to torture;

6.     Order Respondents to allow counsel to meet and confer with Petitioner Barhoumi, in private and unmonitored attorney-client conversations;

7.     Order Respondents to cease all interrogations of Petitioner Barhoumi, direct or indirect, while this litigation is pending;

8.     Order Respondents to cease all acts of torture and cruel, inhumane and degrading treatment of Petitioner Barhoumi;

9.     Order and declare that the Military Order of November 13, 2001 is *ultra vires* and unlawful in violation of Article II of the United States Constitution, the Fifth Amendment to the U.S. Constitution, the Uniform Code of Military Justice, the Administrative Procedures Act, 5 U.S.C. §702, the treaties of the United States and customary international law;

10.    Order and declare that the prolonged, indefinite, and restrictive detention of Petitioner Barhoumi without due process is arbitrary and unlawful and a deprivation of liberty without due process in violation of common law principles of due process, the Due Process Clause of the Fifth Amendment to the United States Constitution, the regulations of the United States military, the treaties of the United States, and customary international humanitarian law;

11.    Order and declare that continued obligating or expending of funds appropriated under HR 1268 to fund the construction, maintenance or operation of prisons, camps or other facilities at Guantánamo Bay is unlawful, and enjoin Respondents from further obligating or expending funds appropriated under HR 1268 for the construction, maintenance or operation of prisons, camps or other facilities at Guantánamo Bay;

12.    Issue an Order declaring unconstitutional and invalid and enjoining any and all Commission proceedings and/or findings against Petitioner Barhoumi;

13.    Enter and Order declaring the Combatant Status Review Tribunal unconstitutional and invalid, and enjoin its operation with respect to Petition Barhoumi;

14.    Issue a writ of mandamus and an Order that orders Respondents not to use the PMO and/or Military Commission Orders and Instructions to detain Barhoumi, or adjudicate charges against Petitioner Barhoumi, or conduct any proceedings related to such charges, because those Orders and instructions violate the U.S. Constitution, U.S. law, and U.S. treaty obligations, both facially and as applied to Petitioner Barhoumi and are therefore *ultra vires* and illegal;

15.    After notice and hearing, determine and declare that Petitioner Barhoumi's detention violates the Constitution, laws, treaties, and regulations of the United States; that the PMO is unconstitutional; that Barhoumi has been denied a speedy trial; and that Respondents lack any jurisdiction over Petitioner Barhoumi;

16.    After notice and hearing, issue a writ of mandamus that directs Respondents to obey their clear, nondiscretionary duty to follow the Constitution, laws, regulations, and treaties of the United States, and therefore to release Petitioner Barhoumi immediately; and

17.    Grant such other relief as the Court may deem necessary and appropriate to protect Petitioner's rights under the common law, the United States Constitution, federal statutory law, and international law.

*Remainder of page left intentionally blank*

68

Dated this 13th day of December, 2005

Respectfully submitted,

Counsel for Petitioners:

/s/ Mona L. Burton

Mona L Burton (Utah State Bar #5399)
Robert G. Wing (Utah State Bar #4445)
James R. Farmer (Utah State Bar #8592)
Amy Poulson (Utah State Bar #9378)
Scott S. Barker (Colorado State Bar # 11177)
J. Triplett Mackintosh (Colorado State Bar #22359)
Rick D. Bailey (Colorado State Bar # 26554)
Hamid M. Khan (Colorado State Bar #34139)
HOLLAND & HART LLP
60 East South Temple, Suite 2000
Salt Lake City, UT  84111
Tel: (801) 595-7800

Of Counsel
Barbara J. Olshansky (New York State Bar #3635)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
New York, New York 10012
Telephone: (212) 614-6439

## CERTIFICATION OF REPRESENTATION WITHOUT COMPENSATION

Counsel for Petitioner certify, pursuant to L. Cv. R. 83.2(g), that they are representing Petitioner without compensation, and further pursuant to L. Cv. R. 83.2(j), that they have personal familiarity with the Local Rules of this Court.


Dated this 13th day of December, 2005.


/s/ Mona L. Burton

_____

Mona L. Burton
Robert G. Wing
James R. Farmer
Amy Poulson
J. Triplett Mackintosh
Hamid M. Khan
HOLLAND & HART LLP
60 East South Temple, Suite 2000
Salt Lake City, UT 84111
Tel: (801) 595-7800

Of Counsel
Barbara J. Olshansky
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
New York, New York 10012
Telephone: (212) 614-6439

3488827_1.DOC

70

EXHIBIT A

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| SUFYIAN BARHOUMI | ) **CHARGE:** |
| a/k/a Abu Obaida | ) **CONSPIRACY** |
| a/k/a Ubaydah Al Jaza'iri | ) |
| a/k/a Shafiq | ) |
| | ) |
| | ) |

## JURISDICTION

1.  Jurisdiction for this Military Commission is based on the President's determination of July 6, 2004 that Sufyian Barhoumi (a/k/a Abu Obaida a/k/a/ Ubaydah Al Jaza'iri a/k/a/ Shafiq hereinafter "Barhoumi") is subject to his Military Order of November 13, 2001.

2.  The charged conduct alleged against Barhoumi is triable by a military commission.

## GENERAL ALLEGATIONS

3.  Al Qaida ("the Base"), was founded by Usama bin Laden and others in or about 1989 for the purpose of opposing certain governments and officials with force and violence.

4.  Usama bin Laden is recognized as the *emir* (prince or leader) of al Qaida.

5.  A purpose or goal of al Qaida, as stated by Usama bin Laden and other al Qaida leaders, is to support violent attacks against property and nationals (both military and civilian) of the United States and other countries for the purpose of, *inter alia*, forcing the United States to withdraw its forces from the Arabian Peninsula and in retaliation for U.S. support of Israel.

6.  Al Qaida operations and activities are directed by a *shura* (consultation) council composed of committees, including: political committee; military committee; security committee; finance committee; media committee; and religious/legal committee.

7.  Between 1989 and 2001, al Qaida established training camps, guest houses, and business operations in Afghanistan, Pakistan, and other countries for the purpose of training and supporting violent attacks against property and nationals (both military and civilian) of the United States and other countries.

8.  In 1992 and 1993, al Qaida supported violent opposition of US. property and nationals by, among other things, transporting personnel, weapons, explosives, and ammunition to Yemen, Saudi Arabia, Somalia, and other countries.

9. In August 1996, Usama bin Laden issued a public *"Declaration of Jihad Against the Americans,"* in which he called for the murder of U.S. military personnel serving on the Arabian peninsula.

10. In February 1998, Usama bin Laden, Ayman al Zawahiri, and others, under the banner of "International Islamic Front for Fighting Jews and Crusaders," issued a *fatwa* (purported religious ruling) requiring all Muslims able to do so to kill Americans – whether civilian or military – anywhere they can be found and to "plunder their money."

11. On or about May 29, 1998, Usama bin Laden issued a statement entitled "The Nuclear Bomb of Islam," under the banner of the "International Islamic Front for Fighting Jews and Crusaders," in which he stated that "it is the duty of the Muslims to prepare as much force as possible to terrorize the enemies of God."

12. Since 1989 members and associates of al Qaida, known and unknown, have carried out numerous terrorist attacks, including, but not limited to: the attacks against the American Embassies in Kenya and Tanzania in August 1998; the attack against the *USS COLE* in October 2000; and the attacks on the United States on September 11, 2001.

## CHARGE: CONSPIRACY

13. Sufyian Barhoumi, Jabran Said bin al Qahtani, and Ghassan al Sharbi in the United States, Afghanistan, Pakistan, and other countries, from on or about January 1996 to on or about March 2002, willfully and knowingly joined an enterprise of persons who shared a common criminal purpose and conspired and agreed with Usama bin Laden (a/k/a Abu Abdullah), Saif al Adel, Dr. Ayman al Zawahiri (a/k/a "the Doctor"), Muhammad Atef (a/k/a Abu Hafs al Masri), Zayn al Abidin Muhammad Husayn (a/k/a/ Abu Zubayda, hereinafter "Abu Zubayda"), Binyam Muhammad, Noor al Deen, Akrama al Sudani and other members and associates of the al Qaida organization, known and unknown, to commit the following offenses triable by military commission: attacking civilians; attacking civilian objects; murder by an unprivileged belligerent; destruction of property by an unprivileged belligerent; and terrorism.

14. In furtherance of this enterprise and conspiracy, al Sharbi, Barhoumi, al Qahtani, Abu Zubayda, Binyam Muhammad, Noor al Deen, Akrama al Sudani, and other members or associates of al Qaida committed the following overt acts:

    a. In 1998 Barhoumi, an Algerian citizen, attended the electronics and explosives course at Khalden Camp in Afghanistan, an al Qaida-affiliated training camp, where he received training in constructing and dismantling electronically-controlled explosives.

2

b.  After completing his training, Barhoumi became an explosives trainer for al Qaida, training members of al Qaida on electronically-controlled explosives at remote locations.

c.  In or about August 2000, al Sharbi, a Saudi citizen and Electrical engineering graduate of Embry Riddle University, in Prescott, Arizona, departed the United States in search of terrorist training in Afghanistan.

d.  In July 2001, Muhammad Atef (a/k/a/ Abu Hafs al Masri), the head of al Qaida's military committee and al Qaida's military commander, wrote a letter to Abu Muhammad, the *emir* of al Qaida's al Farouq Camp, asking him to select two "brothers" from the camp to receive electronically-controlled explosives training in Pakistan, for the purpose of establishing a new and independent section of the military committee.

e.  In July 2001, al Sharbi attended the al Qaida-run al Farouq training camp, where he was first introduced to Usama bin Laden.  At al Farouq, al Sharbi's training included, *inter alia*, physical training, military tactics, weapons instruction, and firing on a variety of individual and crew-served weapons.

f.  During July and August 2001, al Sharbi stood watch with loaded weapons at al Farouq at times when Usama bin Laden visited the camp.

g.  From July 2001 to September 13, 2001, al Sharbi provided English translation for another camp attendee's military training at al Farouq, to include translating the attendee's personal *bayat* ("oath of allegiance") to Usama bin Laden.

h.  On or about September 13, 2001, anticipating a military response to al Qaida's attacks on the United States of September 11, 2001, al Sharbi and the remaining trainees were ordered to evacuate al Farouq.  Al Sharbi and others fled the camp and were told to fire warning shots in the air if they saw American missiles approaching.

i.  Shortly after the September 11 2001 attacks on the United States, al Qahtani, a Saudi citizen and Electrical engineering graduate of King Saud University in Saudi Arabia, left Saudi Arabia with the intent to fight against the Northern Alliance and American Forces, whom he expected would soon be fighting in Afghanistan.

j.  In October 2001, al Qahtani attended a newly established terrorist training camp north of Kabul, where he received physical conditioning, and training in the PK Machine gun and AK-47 assault rifle.

k. Between late December 2001 and the end of February 2002, Abu Zubayda, a high-ranking al Qaida recruiter and operational planner, assisted in moving al Sharbi, al Qahtani and Binyam Muhammad from Birmel, Afghanistan to a guest house in Faisalabad, Pakistan where they would obtain further training.

l. By early March 2002, Abu Zubayda, Barhoumi, al Sharbi, al Qahtani, and Binyam Muhammad had all arrived at the guest house in Faisalabad, Pakistan. Barhoumi was to train al Sharbi, al Qahtani and Binyam Muhammad in building small, hand-held remote-detonation devices for explosives that would later be used in Afghanistan against United States forces.

m. In March 2002, after Barhoumi, al Sharbi and al Qahtani had all arrived at the guest house, Abu Zubayda provided approximately $1,000 U.S. Dollars for the purchase of components to be used for training al Sharbi and al Qahtani in making remote-detonation devices.

n. Shortly after receiving the money for the components, Barhoumi, Noor al Deen and other individuals staying at the house went into downtown Faisalabad with a five page list of electrical equipment and devices for purchase which included, *inter alia*, electrical resistors, plastic resistors, light bulbs for circuit board lights, plastic and ceramic diodes, circuit testing boards, an ohmmeter, watches, soldering wire, soldering guns, wire and coil, six cell phones of a specified model, transformers and an electronics manual.

o. After purchasing the necessary components, al Qahtani and al Sharbi received training from Barhoumi on how to build hand-held remote-detonation devices for explosives while at the guest house.

p. During March 2002, after his initial training, al Qahtani was given the mission of constructing as many circuit boards as possible with the intent to ship them to Afghanistan to be used as timing devices in bombs.

q. After their training was completed and a sufficient number of circuit boards were built, Abu Zubayda had directed that al Qahtani and al Sharbi were to return to Afghanistan in order to use, and to train others to construct remote-control devices to detonate car bombs against United States forces.

r. During March 2002 al Qahtani wrote two instructional manuals on assembling circuit boards that could be used as timing devices for bombs and other improvised explosive devices.

4

15. On March 28, 2002, Barhoumi, al Sharbi, al Qahtani, Abu Zubayda and others were captured in a safe house in Faisalabad after authorities raided the home.