**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHAFIIQ (Last Name Unknown), *et al.*, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| *v.* ) | 05-CV-1506 (RMC) |
| ) | |
| GEORGE W. BUSH, *et al.*, ) | |
| ) | |
| Respondents. ) | |

**PETITIONER'S OPPOSITION TO RESPONDENTS' MOTION FOR PROCEDURES
RELATED TO REVIEW OF CERTAIN DETAINEE MATERIALS
AND REQUEST FOR EXPEDITED BRIEFING AND RESPONSE TO NOTICE OF
WITHDRAWAL**

Petitioner Sufyian Barhoumi (a/k/a Shafiiq) through his counsel, Holland & Hart LLP,

respectfully submits his Opposition to Respondents' Motion for Procedures Related to Review of

Certain Detainee Materials and Request for Expedited Briefing.[1]  Petitioner has been charged

and has criminal defense counsel.  Petitioner's privileged communications with his criminal

counsel are subject to criminal protective orders.  Further, Petitioner is being detained in Camp 5,

---

[1] On July 20, 2006, Respondents filed a Notice of Withdrawal of Motion for Procedures Related
to Review of Certain Detainee Materials and Request for Expedited Briefing (the "Notice"),
Docket No. 37.  It is not clear from the Notice why Respondents are withdrawing their motion in
this particular case.  The Notice includes two possible bases for withdrawal: (1) a determination
that Petitioner has not had attorney-client materials impounded; or (2) an inability to identify
Petitioner as a detainee currently detained at Guantanamo.  With respect to the first possible
basis for withdrawal, Respondents have not made clear whether the government seized materials
from Petitioner, but then determined that such materials were not privileged, or whether the
government has seized no materials from Respondent.  Particularly where criminal charges have
been filed against Petitioner, it is imperative that the attorney-client privilege be preserved, and
that Petitioner understand that this privilege will be protected against intrusion by Respondents.
Due to the ambiguities inherent in the Notice, Petitioner's counsel has remaining concerns about
possible seizure of materials from Petitioner.  Petitioner therefore submits his opposition to
Respondents' Motion, despite Respondents' withdrawal of same.

and Petitioner's counsel believes it is virtually impossible for detainees to pass information in that camp, let alone communicate with detainees in other camps.  Under these circumstances, Respondents ought to come forward with concrete information regarding why they should have access to his privileged materials.

Respondents' motion should be denied.  The materials in question are privileged attorney-client communications.  As a matter of fundamental principle, those communications were supposed to be secure against seizure and review by the government.  The government's seizure and review of those communications, without prior approval by the Court and notice to counsel, was illegal.  The government's failure to disclose its actions to the Court and counsel until nearly a month after the fact is inexcusable.  In the name of investigating three prisoner deaths, the government has invaded a fundamental privilege and shattered any confidence the prisoners might still have had that their communications with their counsel would be safe from the government's prying eyes.  The American Bar Association has called for an investigation of the military's massive breach of the privilege.[2]

The stakes are too high for the Court simply to accept the factual assertions that form the basis of the government's instant motion.  The government claims that the privileged communications were seized and examined in the course of an investigation into the suicide deaths of three prisoners.  But without independent verification, the Court cannot be certain that the prisoner deaths *were* suicides.  The government claims that the contents of privileged communications initially seized and reviewed supported its wholesale seizure and review of all

---

[2]    *See* Letter dated July 12, 2006, from Michael s. Greco, President, American Bar Association, to Senators Arlen Specter and Patrick Leahy.  (Attached as Exhibit A.)

privileged communications, but without examining the communications, the Court cannot be certain what they contained.

Petitioner has no way of independently investigating the government's allegations. At present, there is no basis for alleging, and Petitioner does not allege, that the prisoner deaths were not suicides, or that the government is concealing any wrongdoing. But in view of the privilege issue, the Court cannot afford simply to take the government at its word. Under these circumstances, the Court should impound the seized communications until it can decide whether further review of any of the communications is to be allowed. That decision should be made only after Petitioner has been given the opportunity to explore the government's allegations. If the Court decides to allow any further review, the government should not be allowed to use such review as a fishing expedition. The review should be conducted in the first instance by a magistrate judge or a special master without the involvement of the military or the Department of Justice.

## ARGUMENT[3]

### A. The Government Has Wrongfully Seized Petitioner's Legal Papers Without Prior Approval by the Court and Notice to Counsel.

On June 10, 2006, the military reported that three prisoners at Guantánamo Bay had been found dead in their cells.[4] The military reported the prisoners' deaths as suicides.[5]

---

[3]    The government argues in a footnote to its motion that the Detainee Treatment Act divested the Court of jurisdiction over all of the Guantánamo habeas cases. (Mot. at 2 n.3.) The Supreme Court, however, has held that "§ 1005(e)(1) does not strip federal courts' jurisdiction over cases pending on the date of the DTA's enactment." *Hamdan v. Rumsfeld*, slip op. 20 n.15. By its filing of the instant motion, the government implicitly acknowledges the Court's continuing jurisdiction.

[4]    Sara Wood, *Three Guantanamo Bay Detainees Die of Apparent Suicide*, June 10, 2006, *available at* http://www.defenselink.mil/news/Jun2006/20060610_5379.html.

In his news conference announcing the prisoners' deaths, Navy Rear Adm. Harry B. Harris, the commander of Joint Task Force–Guantánamo, denounced the deaths as an act of warfare:  "I believe this was not an act of desperation, but an act of asymmetric warfare aimed at us here at Guantánamo," he said. "We have men here who are committed jihadists. They are dangerous men and they will do anything they can to advance their cause."[6]  Colleen Graffy, Deputy Assistant Secretary of State for Public Diplomacy, called the deaths "a good PR move."[7]

Although the military reported the deaths as suicides, Admiral Harris requested an "investigation" by the Naval Criminal Investigative Service (NCIS) to establish the "official cause and manner of death."[8]  Now, nearly a month later, the government has disclosed that, between June 10 and June 18, as part of the purported "investigation," NCIS seized and examined over half a ton of written communications between Guantánamo prisoners and their lawyers.  The government claims that it seized these materials because notes found in the cells of the dead prisoners suggested the illicit use of privileged materials for communications among the prisoners; but there is no way to know whether the notes suggested such use of privileged communications or, if they did, whether that was the actual reason for the government's subsequent actions.

The government seized and examined these privileged communications over an eight-day period without court approval or supervision, and without prior notice to the prisoners' counsel,

---

[5]      *Id.*

[6]      *Id.*

[7]      Peter Graff, *U.S. Rows Back From Guantanamo Suicide Comments*, June 12, 2006 (Reuters), *available at* http://www.cageprisoners.com/articles.php?id=14438.

[8]      Reuters, *Three Guantanamo Detainees Die, US Army*, June 11, 2006. *available at* http://www.cageprisoners.com/articles.php?id=14371.

and then waited nearly a month before disclosing its actions to the Court and counsel.  The government's seizure and examination of these materials violated the attorney-client privilege.

Having belatedly disclosed its illegal seizure and inspection of these privileged materials, the government now asks the Court to condone its actions and permit it to retain the seized materials and examine them even more closely.  It comes as no surprise that the government sought judicial sanction for its actions only after habeas counsel, informed of the government's actions by their clients, began to seek relief from the Court.[9]  The government obviously foresaw a deluge.  True to the adage that the best defense is a good offense, it now seeks to preempt further requests for relief by obtaining blanket *post hoc* court approval of its actions.

The fact that detainees' legal papers were seized over an eight-day period demonstrates that no exigent circumstances required the government to act without first seeking the approval of the Court and notifying counsel.  At the very least, a conference call with counsel and the Court on June 10, the day of the prisoner deaths, could have been arranged.

### B. The Premise Of The Government's Investigation Is Invalid, And The Government's Motion Is Premature.

The Court should not allow the government to examine the seized materials on the premise that the three prisoners' deaths were acts of "warfare" or "a good PR move," or that prisoners may be conspiring to take their own lives.  The situation that the prisoners confront – up to five years of confinement on an isolated island without being charged with an offense and without being told on what evidence they are being confined, and no end of their confinement in sight – is sufficient to account for any suicidal acts.  The government's attempt to depict the

---

[9]     Mot. To Modify Stay To Direct Resp'ts To Return Impounded Privileged Legal Material and for Other Relief, *Abdullah v. Bush*, No. 05-00023(RWR) (filed July 5, 2006).  The government states that its instant motion is an opposition to the *Abdullah* motion.  U.S. Mot. at 1 n.1.

apparent suicides as acts of warfare is a transparent effort to obscure that fact. The government's claims of "plots" and "conspiracies" among the prisoners to end their own lives appear to be merely a pretext for examining privileged communications. The prisoners have long engaged in concerted "self-harm" activity, from hunger strikes to mass hangings, but the government never before sought to exploit that activity to justify seizure and review of privileged communications.

If prisoners take their own lives at Guantanamo, it is undoubtedly because of the hopelessness of their situation and, at least in some instances, the effect of the government's interrogation techniques on their mental health.[10] Breaking the prisoners' spirits and psyches for the purpose of collecting intelligence is Guantanamo's *raison-d'etre*. As Physicians for Human Rights has stated, "psychological torture [is] central to the interrogation process and reinforced through conditions of confinement."[11]

Prisoners have also been subjected to a variety of other cruel, inhuman, and degrading treatment, including prolonged exposure to extreme heat and cold, religious humiliations (including abuse of the Koran and interference with prayers), threats of execution, threats against family, and prolonged solitary confinement. The classified 50-day interrogation logs of one "high value" detainee, published last year by *Time*, disclose terrors from which no human could

---

[10]     The description in the text is based on publicly available information, which the undersigned believe to have been reported by reliable sources. Petitioner's counsel have not been given the opportunity to investigate the conditions of the detainees' confinement.

[11]     Physicians for Human Rights, *Break Them Down: Systematic Use of Psychological Torture by US Forces* 1 (2005). Approved interrogation techniques have included "Removal from social support at Camp Delta"; "Segregation in Navy Brig"; "Isolation in Camp X-Ray"; "Deprivation of light"; "Inducing stress [through] use of female interrogator"; "Up to 20-hour interrogations"; "Removal of all comfort items, including religious items." Dep't of Defense, *GTMO Interrogation Techniques* (June 22, 2004). Evidence indicates that the government has also used even more brutal techniques, labeled "Fear Up Harsh," "Sleep Adjustment," and "Futility." Dep't of Defense, *Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy, and Operation Considerations* at A1-A3 (2003), *available at* http://www.ccr-ny.org/v2/reports/docs/PentagonReportMarch.pdf.

be expected to emerge mentally intact.[12]  Government doctors "assisted in the design of

interrogation strategies, including sleep deprivation and other coercive methods tailored to

detainees' medical conditions.  Medical personnel also coached interrogators on questioning

technique."[13]

Predictably, these tactics have caused the mental health of many Guantánamo prisoners

to deteriorate.  According to government data, prisoners committed 350 acts of "self-harm" in

2003, of which 120 were attempted hangings.[14]  In August 2003, 23 men attempted to hang

themselves.[15]  The government chose to describe all but two of these hangings as incidents of

---

[12]    According to the interrogation logs, authorities held this prisoner in solitary confinement until he became delusional; subjected him to weeks of interrogations lasting 18-20 hours a day; made him bark, growl, and perform dog tricks; forced him to wear a woman's bra and placed a thong on his head; menaced him with dogs; hydrated intravenously and then denied access to a toilet; and, even after his heartbeat had slowed to 35 beats per minute and he was placed in a doctor's care, played screaming loud music in his cell to "prevent detainee from sleeping."  The Deputy Assistant Director of the FBI complained to the Pentagon about this treatment after finding this prisoner in his cell "evidencing behavior consistent with extreme psychological trauma (talking to non-existent people, reporting hearing voices, crouching in a corner of the cell covered with a sheet for hours on end)."  Letter from T.J. Harrington, Dep'y Assist. Dir., FBI Counterterrorism Div., to Maj. Gen. Donald J. Ryder, U.S. Army (July 14, 2004).

[13]    M. Gregg Bloche & Jonathan H. Marks, *When Doctors Go to War*, New Eng. J. Med., Jan. 6, 2005, at 3.  According to the British medical journal *The Lancet*, "medical records [have been] routinely shared with interrogators in clear breach of confidentiality and with the knowledge that such information can be misused[,] despite objections by the medical team of the International Committee of the Red Cross." Editorial, *How Complicit are Doctors in Abuses of Detainees?*, The Lancet, Aug. 21, 2004, at 637; *see also* Jane Mayer, *The Experiment*, New Yorker, July 11 & 18, 2005, *available at* http://www.cageprisoners.com/downloads/Mayer.pdf. The American Medical Association ("AMA") and American Psychiatric Association ("APA") have now adopted ethical guidelines that limit participation in interrogation.  *See* AMA, *New AMA Ethical Policy Opposes Direct Physician Participation in Interrogation*, June 12, 2006, *available at* http://www.ama-assn.org/ama/pub/category/16446.html; APA, *APA Statement on Psychiatric Practices at Guantanamo Bay*, June 27, 2005, *available at* http://www.psych.org/news_room/ press_releases/05-40psychpracticeguantanamo.pdf.

[14]    *See* Mark Denbeaux, *Report: The Guantánamo Detainees During Detention* (July 10, 2006), at 6 (Attached as Exhibit B).

[15]    *Id.*

7

"manipulative self-injurious behavior," rather than as suicide attempts.[16]  In 2004, also according to government data, prisoners committed another 110 acts of "manipulative self-injurious behavior," though it did not report how many of these 110 incidents were attempted hangings.[17]  Even with its penchant for defining away suicides as "manipulative self-injurious behavior," the government has acknowledged that 29 prisoners have attempted suicide a total of 41 times.

Once other habeas counsel started meeting with their clients and began to recognize the depressive symptoms they had developed, they made repeated requests of the Department of Justice to bring outside doctors to the prison to perform independent medical examinations of their clients.  All such requests, including requests for the release of their clients' medical records, were refused.

The tragic results were predictable.  Last fall, counsel for Jumah al Dossari found his client hanging from the wire meshing of an interview cell, his wrist slashed and a pool of blood gathering under his body.  Previously, Mr. Dossari's counsel had sought an injunction requiring, among other things, access to his client's medical records.  The government opposed this motion, claiming that the "the Guantánamo medical staff provide appropriate medical and mental health services to all detainees through a thorough, coordinated team approach, based on individualized treatment plans that account for each patient's conditions and circumstances."[18]

On May 18, 2006, four more prisoners reportedly attempted suicide by overdosing on medicines they had hoarded, but in a statement released the following day, Commander Harris stated that only two of these efforts were counted as "suicide attempts," apparently because only

---

[16]     *Id.* at 14.

[17]     *See id.* at 6.

[18]     Gov. Opp'n to Mot. for TRO & Prelim. Injunction, *Almurbati v. Bush*, No. 04-1227 (RBW) (filed Nov. 16, 2005) at 10.

two prisoners lost consciousness due to their attempts.[19]  Two others complained of dizziness

and nausea, one claiming that he had attempted suicide but did not have enough pills.  These

latter two received a medical and psychiatric evaluation, but Commander Harris called these

prisoners "attention-seeking sympathizers who were not trying to actually commit suicide."[20]

Less than a month later, on June 10, 2006, the three deaths that led to the instant motion

occurred.  In light of the history, purpose, and nature of Guantánamo, it is impossible to support

the government's assertion that the deaths were acts of belligerence, rather than of despair.  At

the very least, the government must demonstrate to the Court a factual basis to support its

assertion that these deaths *were* suicides before it engages in the wholesale seizure of privileged

papers as part of an investigation of a suicide "plot" or "conspiracy."

### C.  The Government Has No Authority To Seize Petitioner's Legal Papers.

This Court has ruled that detainees held at Guantánamo have a right to representation by

and access to counsel.  It has recognized the privilege that applies to communications between

the detainees and their lawyers, and it has gone to great lengths to protect that privilege by

creating access procedures protecting the confidentiality of attorney-client communications.

Nonetheless, the government committed a massive breach of the privilege.  Now the

government asks the Court to condone an even more significant breach of the privilege by

permitting it to review further the over half-ton of legal materials that it has seized.  This Court

should not approve the request.  At a minimum, the Court should not allow further review except

---

[19]    Kathleen T. Rehm, *Skirmish With Guards, Two Suicide Attempts Test Guantanamo Procedures*, May 19, 2006, *available at* http://www.defenselink.mil/news/May2006/20060519_5177.html.

[20]    Dep't of Defense, *Statement on Suicide Attempts at Guantanamo*, May 19, 2006, *available at* http://www.southcom.mil/PA/Media/Releases/Media%20Advisory%20-%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% 20-%201%20-%20Press%20briefing.pdf.

by a magistrate or special master, and it should not allow review absent individualized showings by the government that the seizure and review of the materials *as to each detainee* is justified.

    **1.   The Government Has Long Sought To Prevent the Guantánamo Prisoners From Having the Assistance of Counsel.**

The Court should consider the government's recent actions, and its instant motion, in light of its fierce five-year effort to undermine that relationship. Most of the prisoners at Guantánamo have been held there for nearly five years. Four-and-a-half years ago, when the first next-friend habeas petitions were filed on behalf of prisoners, the government responded by asserting that the prisoners had no right to seek relief in federal court and no rights for a federal court to enforce. While these issues were being litigated, the government denied the prisoners access to counsel.

In 2004, the Supreme Court rejected "the proposition of Guantánamo Bay as a legal black hole."[21] Unfazed, the government insisted that "detainees' access to counsel existed purely at the pleasure of the government, with restrictions to be imposed as it saw fit."[22] Judges of this Court "flatly rejected" the government's position and its effort to impose "significant restrictions on attorney-client communications, including real-time monitoring of counsel meetings with detainees."[23]

Once counsel began to meet with their clients, the government immediately undertook to undermine the attorney-client relationship. Interrogators fueled mistrust of the lawyers among the prisoners and punished prisoners for meeting with lawyers. For instance, interrogators told

---

[21]    *Adem v. Bush*, 425 F. Supp. 2d 7, 11 (D.D.C. 2006) (citing *Rasul v. Bush*, 542 U.S. 466 (2004)).

[22]    *Id.* at 12.

[23]    *Id.* at 11–12.

several prisoners that their lawyers were spies.  Interrogators asked other prisoners, "did you

know your lawyers are Jews?"[24] and warned prisoners that they would never be released if they

retained counsel.  Immediately after they met with their lawyers for the first or second time,

several detainees were forced to wear immodest clothing, subjected to extreme temperatures, or

prohibited from praying.  Several detainees have had their legal papers searched.

### 2.  Petitioner's Attorney-Client Materials Cannot Be Seized And Reviewed Without An Individualized Showing Of Probable Cause.

The attorney-client privilege is "the oldest of the privileges for confidential

communications known to the common law."[25]  Its purpose is to "encourage full and frank

communication between attorneys and their clients and thereby promote broader public interests

in the observance of law and administration of justice."[26]  As this Court has recognized in the

context of the Guantánamo litigation, "[t]he privilege that attaches to communications between

counsel and client has long held an exceptional place in the legal system of the United States."[27]

Nowhere is the effectuation of the privilege more important than in the context of pre-

trial detention.  "An inmate's need for confidentiality in his communications with attorneys

through whom he is attempting to redress his grievances is particularly important."[28]  For such

---

[24]     Frank Davies, U.S. Interrogators Accused of Trying to Divide Detainees, Attorneys (Knight Ridder), May 13, 2005, available at http://www.commondreams.org/headlines05/0513-04.htm.

[25]     *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[26]     *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *see also Lanza v. State of New York*, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.").

[27]     *Al Odah*, 346 F. Supp. 2d at 10.

[28]     *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials.  When this interest is (continued…)

prisoners, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts."[29]  Even for prisoners convicted of crimes, the Supreme Court has held, "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid."[30]

Seizure of legal papers is particularly egregious because it strikes at the heart of the attorney-client relationship and interferes with the inmate's access to the courts, especially, as here, where Petitioner has been charged with an alleged crime.  "The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts…. [T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest."[31]  The government's vague allegations of notes found in a deceased's cell written by another prisoner cannot qualify as a "legitimate penological interest" in seizing *all* legal documents from *all* detainees.  Seizing legal papers interferes with a detainee's access to courts and chills the giving,

---

inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised.").

[29]    *Bach*, 504 F.2d at 1102.

[30]    *Procunier v. Martinez*, 416 U.S. 396, 419 (1974).

[31]    *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted); *see also Simmons v. Dickhaut*, 804 F.2d 182, 183–84 (1st Cir. 1986) ("Many courts have found a cause of action for violation of the right of access stated where it was alleged that prison officials confiscated and/or destroyed legal materials or papers."); *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986) ("The allegation that prison officials seized [the plaintiff's] pleadings and law book and destroyed other legal papers clearly states a claim of denial of access to the courts."); *Carter v. Hutto*, 781 F.2d 1028, 1031–32 (4th Cir. 1986) (plaintiff alleged a valid claim of denial of access to courts when he alleged that his legal materials were confiscated or destroyed); *Hiney v. Wilson*, 520 F.2d 589, 591 (2d Cir. 1975) (alleged confiscation of legal papers would have denied plaintiff access to the courts).

receiving, and continued possession of communications from attorney to client, particularly when seized without notice to the detainees' attorneys or the court.

This Court has recognized that Petitioner – who has not been tried and who seeks the opportunity through his counsel to challenge the basis of his detention – has a right to counsel and is entitled to a confidential relationship with his counsel.  Over the government's objections, "[t]he Court [found] that Petitioners are entitled to be represented by counsel."[32]  Thus, "the Court determine[d] that the government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them."[33]  Yet the government has decided, in the teeth of this decision, "to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communication between them."[34]

Abrogation of the attorney-client privilege in any context requires the government to make a specific, *individualized* showing that there is sufficiently compelling justification for invading the privilege.  For example, where the government invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of making an adequate showing that the exception applies – i.e., that *that* client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act.[35]  Similarly, when the government seizes materials from a location that likely contains

---

[32]     *Al Odah*, 346 F. Supp. 2d at 5.

[33]     Id.

[34]     *Id.*

[35]     *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also Doe v. United States*, No. 03-6145, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where government failed to meet burden of showing that crime-fraud exception applied); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a (continued…)

privileged papers, that seizure must be supported by probable cause and a warrant, and it still must employ appropriate means of screening out privileged materials.[36]

The government has not cited any cases that suggest the privilege may be invaded without an *individualized*, sufficiently rigorous showing that that materials of a particular client or particular attorney are likely to have been abused in furtherance of a crime.[37]  Even when such documents will be reviewed *in camera* by the court – and not by the government – "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."[38]

### 3. The Government Has Made No Such Individualized Showing.

The government has presented no specific evidence that Petitioner has misused his attorney-client materials.  Indeed, the government does not even purport to do so.  Four or five documents seized from just a few prisoners cannot justify seizing over half-a-ton of privileged materials from hundreds of prisoners.

These documents, moreover, offer little support for the government's position that attorney-client materials are being misused – let alone specific evidence that Petitioner has

---

crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce).

[36]    *See, e.g., United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

[37]    *See, e.g.*, *United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (permitting review of attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and execution of the warrant"); *United States v. Grant*, No. 04 CR 207, 2004 WL 1171258, at *2 (S.D.N.Y. Dec. 14, 1982) (documents "seized pursuant to a valid warrant, which was based upon a [judicial] finding of probable cause").

[38]    *Zolin*, 491 U.S. at 572 (quotations and citations omitted).

misused such materials.  The initial documents cited by the government were found either in the possession of one of the deceased or were written by one of the deceased.  And the additional documents are telling in what they reveal – not a single inappropriate document was found in an attorney-client envelope.

First, the document labeled "FOUO" is a red herring.  "FOUO" or "For Official Use Only" stamps are *not* classification designations; documents so-labeled are not necessarily sensitive in any manner.  "FOUO" is nothing but an internal Department of Defense designation whose purpose is to determine whether a particular document may be released to the public under the Freedom of Information Act.  "The abbreviation 'FOUO' is used to designate *unclassified* portions that contain information that may be exempt from mandatory release to the public under [FOIA] …."[39]  The designation is specifically "not authorized as an anemic form of classification to protect national security interests"[40] and in fact "is, by definition, unclassified."[41]  Nothing prevents prisoners from being in possession of FOUO documents; such documents by definition represent no security risks, and there is therefore no reason why a prisoner should not legitimately be in possession of such documents.

Second, the document that is marked with a crossed-out "SECRET" stamp is surely *not* a classified document and therefore should be of no concern to NCIS investigators.  (The government, of course, has failed to provide counsel with copies of the documents it relies upon for the instant motion, so counsel can only make an educated guess about the nature of the formerly "SECRET" document.)  Based on counsel's experience with handling the documents in

---

[39]     DoD Regulation 5200.1: C5.2.7.1.1.3 (emphasis added).

[40]     *Id.* 5400.7-R: C4.1.1.

[41]     *Id.* AP3.2.2.3.2.

these cases, it seems quite likely that the document was *once* classified and that – whether by request of counsel or the media, or *sua sponte* by the government – the document was declassified and marked accordingly. It is typical for such documents to have the original "SECRET" stamp crossed out and "Unclassified" written beside it. Nothing prevents prisoners at Guantánamo from possessing unclassified documents, and there is therefore no reason why a prisoner should not legitimately be in possession of such documents. The government's intimation that the document may *really* be a classified document that habeas counsel smuggled out of the secure facility, doctored, and sent on to one of their clients borders on slander.

Third, the so-called "knot-tying" document found by the government is not purported to have been labeled "attorney-client material" and is not alleged to have been discovered in a prisoner's privileged legal folder. (Again, counsel have not seen the document and have no way even to know whether the government's characterization of this document is fair.) The document therefore appears to have no relevance to the instant motion, which after all seeks review only of privileged items that have been confiscated by government agents.

Fourth, an apparent suicide note that was handwritten on the back of a piece of paper marked "attorney-client privileged" was quite obviously not being "hidden" by any of the prisoners. The piece of paper was discovered in the mesh of the cell of one of the deceased, not secreted in the privilege folder of any of the prisoners. If the deceased were seeking to keep this document from the prying eyes of the prison guards by disguising it as a privileged document, why did he place in the open where it would inevitably be discovered? The answer, most probably, is that the prisoner in fact wanted the note to be discovered and that he drafted it on the only piece of paper readily available to him. In all likelihood, the only "abuse" of the privilege

system was one prisoner's agreement to provide the deceased with a piece of paper from his privilege folder in order to allow him to express his last wishes to his family.

Finally, the government does alert counsel and the Court to a single document that – from the government's description of it, anyway – likely should not have been in the possession of a prisoner. Remarkably, however, the document is an *email from JTF-Guantánamo itself* – a document that obviously was not provided to a prisoner by counsel, since counsel does not have access to such documents. How did this document come into possession of a prisoner? Counsel respectfully suggests that the NCIS inquire of JTF-Guantánamo and its staff, rather than take advantage of JTF-Guantánamo's apparent security breakdown as an excuse to rifle through the privileged papers of every detainee in the prison.

The government's generalized security concerns are of the type already rejected by the Court. The government, when it sought to justify the real-time monitoring and recording of attorney-client meetings, claimed that the prisoners would use meetings with counsel "to further terrorist operations or otherwise disclose information that will cause immediate and substantial harm to national security."[42] The Court rejected the government's claims, finding them "thinly supported." As for the government's speculation that detainees' counsel are improperly sharing classified information with their clients, this Court long ago reminded the government that "the government's decision to grant an individual attorney a security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance."[43]

Little has changed – except for the government's new-found concern with suicide prevention. The government introduced interrogation techniques designed to wear down

---

[42]    *Al Odah*, 346 F.2d at 4 n.4.

[43]    *Al Odah*, 346 F. Supp. 2d at 14.

Petitioner's mental health. It resisted any inquiry into detainees' health – even as it recorded hundreds upon hundreds of suicide attempts. After driving detainees to suicide, the government's concern for the mental health of its captives is impossible to take seriously.

### D. Even If The Privilege Must Yield, Review Should Be By A Neutral Party Rather Than A Government Filter Team.

Even if the government has shown sufficient basis to abrogate the attorney-client privilege, the use of a Department of Defense Filter Team is inappropriate here. As confirmed by the government's lack of case citations, courts have shown great reluctance to entrust attorney-client privileged materials to such governmental teams. Indeed, "the use of government taint teams has often been questioned or outright rejected by the courts."[44] Just last week, the Sixth Circuit overruled a district court's decision to permit review of potentially privileged documents by an independent government "taint team" because the review posed unacceptable risks to the attorney-client privilege.[45] Even when such teams have been authorized, "at least three courts that have allowed for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better."[46]

---

[44]     *In re Search of the Scranton Hous. Auth.*, No. 04-MISC Nos. 318-322, 2006 WL 1722565, at *5 (M.D. Pa. June 22, 2006); *see, e.g.*, *Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege); *United States v. Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by search warrant).

[45]     *See In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275, slip op. at 6 (6th Cir. July 13, 2006), *available at* http://www.ca6.uscourts.gov/opinions.pdf/06a0245p-06.pdf.

[46]     *United States v. Stewart*, No. 02 CR 396, 2002 WL 1300059, at *6 (S.D.N.Y. June 11, 2002).

To the extent that the government can make a specific, individualized showing that a particular detainee is using his attorney-client materials for improper ends, the Court at most should order that those documents be reviewed *in camera* by a judge, in the presence of habeas counsel and without government lawyers. This procedure would reduce the appearance of impropriety and relieve detainees of some of their understandable unease over sharing their privileged papers with yet another party who is not their legal representative. Especially given the government's history of interfering with the attorney-client relationships in this case, as well as its expressed desire to "exploit the 'intelligence value'" of monitored attorney-client communications,[47] "it is important that the procedure adopted on this case not only be fair but also appear to be fair."[48] Yet "[i]t is a great leap of faith to expect that members of the general public would believe that any such Chinese wall would be impenetrable; this notwithstanding the honor of [those involved]."[49] Here, "there is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness."[50]

Concerns about the appearance of propriety are especially important here, given the difficulties that Petitioner's criminal counsel has experienced in gaining his trust. Before counsel met Petitioner, he had "been detained virtually incommunicado for nearly three years without being charged with any crime."[51] Moreover, "Petitioner[] face[s] an obvious language barrier, have no access to a law library, and almost certainly lack a working knowledge of the American

---

[47]    *Al Odah*, 346 F. Supp. 2d at 10 n.11.

[48]    *Stewart*, 2002 WL 1300059, at *8.

[49]    *In re Search Warrant for Law Offices*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994).

[50]    *United States v. Neill*, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997).

[51]    *Al Odah*, 346 F. Supp. 2d at 12.

legal system."[52]  Worse, as a result of statements from interrogators and other government

personnel, many detainees suspect that their attorneys are simply guards or interrogators in

disguise.[53]  These suspicions will only intensify when Petitioner learns that his attorney-client

materials are being reviewed by lawyers for the military that detains and interrogates them.

Another unacceptable aspect of the government's proposal is its suggestion that the Filter

Team should be allowed to conduct its own review of the confiscated documents to determine

whether they were properly "privileged" in nature, whether or not the documents are relevant to

the NCIS suicide-plot investigation.[54]  If the filter team determines that the documents are not

privileged, the government proposes, then they will be "returned … to JTF-Guantánamo for

appropriate action."[55]  Such a review for privilege leaves "the government's fox . . . in charge of

the [clients'] henhouse," with no check against the possibility that the Filter Team would draw

"false negative conclusions" overriding legitimate claims of privilege.[56]

The government's motion is a patent attempt to chill attorney-client communications.  In

it, the government suggests that "possibly others" – *i.e.*, non-prisoners – may have participated in

a "manifest abuse of the legal mail system."[57]  This unfounded assertion is a veiled threat to

habeas counsel, designed to deter them from communicating effectively with their clients.

Indeed, buried in a footnote is the government's conclusion that because counsel is prohibited

"from sharing … certain types of materials with detainees … [if] prohibited materials are

---

[52]     *Id.*

[53]     *See*, *e.g.*, Charlie Savage, *Guantánamo Detainees Find Fault with Lawyers*, Boston Globe, Aug. 10, 2005, at A1.

[54]     *See* Resps.' Mot. at 11.

[55]     *Id.*

[56]     In re Grand Jury Subpoenas, slip op. at 10.

[57]     Resps.' Mot. at 10.

discovered in the course of review, the Filter Team would not be constrained from bringing the matter to the Court's attention for appropriate action."[58]  Habeas counsel with access to classified information are aware that they work under the shadow of possible contempt and criminal actions, they have all been deemed not to be a security risk by the FBI, and they are all officers of the Court.  There is no warrant for a new team of Department of Defense lawyers to begin scouring their privileged communications in order to uncover an imagined, nefarious plot to assist their clients in committing suicide.

**E.  This Court Should Impound The Materials Confiscated By The Government Pending Disposition Of The Motion.**

The government cannot be trusted to maintain possession of the attorney-client communications that it has confiscated from Petitioner.  If this court does not order the immediate return of the papers to Petitioner, it should either take possession of the documents itself pending resolution of the motion or else order that the documents be promptly delivered into the possession of counsel for safekeeping.

---

[58]      *Id.* at 11 n.10.

## CONCLUSION

For the preceding reasons, the government's motion should be denied and Petitioner's legal papers should be ordered returned immediately.

Dated: July 21, 2006

Respectfully submitted,


/s Scott S. Barker
Scott S. Barker (Colorado State Bar #11177)
J. Triplett Mackintosh (Colorado State Bar #22359)
Hamid M. Khan (Colorado State Bar #34139)
Meghan N. Winokur (Colorado State Bar #35973)
HOLLAND & HART, LLP
555 Seventeenth Street, Ste. 3200
Denver, CO  80202
Telephone:  (303) 295-8000
Facsimile:   (303) 295-8261

Mona Burton (Utah State Bar #5399)
Robert G. Wing (Utah State Bar #4445)
James R. Farmer (Utah State Bar #8592)
Amy Poulson (Utah State Bar #9378)
HOLLAND & HART, LLP
60 E. South Temple, Ste. 2000
Salt Lake City, UT  84111
Telephone:  (801) 595-7800
Facsimile:  (801) 364-9124



Of Counsel
Barbara J. Olshansky (New York State Bar #3635)
CENTER OF CONSTITUTIONAL RIGHTS
666 Broadway
New York, NY  10012
Telephone:  (212) 614-6439

**ATTORNEYS FOR PETITIONER**

## CERTIFICATE OF SERVICE

I certify that on July 21, 2006, I served a copy of the foregoing document to the following as indicated below:

c/o Preeya Noronha
Peter D. Keisler
Joseph H. Hunt
Kenneth L. Wainstein
Douglas N. Letter
Vincent M. Garvey
Terry M. Henry
James J. Schwartz
Robert J. Katerberg
Nicholas J. Patterson
Andrew I. Warden
Edward H. White
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W. Room 7144
Washington, DC  20530
preeya.noronha@usdoj.gov


/s Scott S. Barker                                    
Holland & Hart LLP

3581131_1.DOC