UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NO FORN~~

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHAFIIQ, *et al.*, ) | |
| ) | |
| **Petitioners,** ) | |
| ) | |
| v. ) | **Civil Action No. 05-1506 (RMC)** |
| ) | |
| BARACK OBAMA, *et al.*, ) | |
| ) | **Filed with Classified** |
| **Respondents.** ) | **Information Security Officer** |
| ) | |
| IN RE PETITION OF ) | CISO _____ |
| SUFYIAN BARHOUMI[1] ) | Date _JUNE 5 2013_ |
| (ISN 694) ) | |
| ) | |

## OPINION

Sufyian Barhoumi, a native of Algeria, is a detainee held by the United States at Guantánamo Bay, Cuba. This Court previously denied his petition for a writ of habeas corpus and was sustained on appeal, on the basis that he was "'part of' an al-Qaida-associated force engaged in hostilities against the United States or its coalition partners and was therefore lawfully detained." *Barhoumi v. Obama*, 609 F.3d 416, 418 (D.C. Cir. 2010). Mr. Barhoumi presents new evidence and argues that he should be relieved from the final judgment against him. The

_____

[1] Petitioner's correct name is uncertain. His counsel identify him as Sufyian Barhoumi and call him Mr. Barhoumi. *See* Pet'r's Mot. Relief [Dkt. 232] at 1. When he appeared before an Administrative Review Board (ARB) at Guantánamo Bay in January 2008, he agreed that his name is Barghomi [sic] Sufyian, and the Presiding Officer referred to him as Mr. Sufyian. *See* Respondent's Excerpted and Highlighted Materials for Oral Argument July 13, 2009, Ex. 11, at 1, 6. Petitioner also used aliases, including "Abu Obaida, Ubaydah al Jaza'iri, and Shafiq." *Barhoumi v. Obama*, 609 F.3d 416, 426 (D.C. Cir. 2010). For clarity, the Court will refer to him as Sufyian Barhoumi.

~~SECRET//NO FORN~~

SECRET//NO FORN

government disagrees. Having considered all of the materials submitted, the underlying record, and the parties' arguments, the Court will deny the motion.

## I. BACKGROUND

Sufyian Barhoumi was captured in Faisalabad, Pakistan, in February 2002, during the height of the hostilities in Afghanistan after the attack on September 11, 2001.[2] He had left Algeria after high school and ended up in London, where he attended a mosque that featured films depicting Russian atrocities against Muslims in Chechnya. "Inspired by these films, Barhoumi traveled to Karachi, Pakistan, and then to Jalalabad, Afghanistan, where he trained to fight alongside the Chechens in their struggle against the Russian government." *Barhoumi*, 609 F.3d at 418. Mr. Barhoumi trained at several military camps in Afghanistan, including Khaldan, a camp run by Abu Zubaydah, "a reputed terrorist leader who commanded his own fighting force" and who was associated with Osama bin Laden, although Abu Zubaydah was not directly under bin Laden's command. *Id.* Abu Zubaydah "had agreed with Usama bin Laden to coordinate training efforts and allow Khaldan recruits to join al-Qaida." *Id.* Along the way, Mr. Barhoumi lost all of the fingers and most of his thumb on one hand when a bomb with which he was training exploded prematurely.

Mr. Barhoumi fled Afghanistan through the mountains into Pakistan in late 2001. "In his ARB hearing, [Mr.] Barhoumi testified that he traveled to a guesthouse in Faisalabad,

---

[2] In this case, the D.C. Circuit prepared both a classified opinion and a redacted, public version. *See* Notice of Filing of D.C. Circuit Mandate and Opinion [Dkt. 237]. In this Opinion, the Court will cite to the public version where possible. The circuit's opinion provides a more detailed summary of the record evidence. *See Barhoumi*, 609 F.3d at 418–19.

SECRET//NO FORN

SECRET//NO FORN

Pakistan, in February 2002," where he was arrested approximately 10 days later "along with Abu

Zubaydah, who was also staying at the Faisalabad guesthouse." *Id.* at 419. Mr. Barhoumi was

taken into U.S. custody in May 2002 and transferred to Guantánamo. *Id.*

Mr. Barhoumi filed a petition for writ of habeas corpus in July 2005. Although

this Court dismissed his case after Congress passed the Military Commissions Act of 2006, 28

U.S.C. § 2241(e), it vacated that decision when the Supreme Court decided *Boumediene v. Bush*,

553 U.S. 723 (2008), and held that Guantánamo detainees have constitutional protections to file

writs of habeas corpus despite the MCA. After extensive briefing, an evidentiary hearing, and

oral argument, this Court denied Mr. Barhoumi's petition on September 3, 2009. *See* Order [Dkt.

219]. The Court, explaining its ruling from the bench, concluded that Mr. Barhoumi was

lawfully detained because the evidence supported the government's claim that he was "part of"

Abu Zubaydah's militia, which was an "associated force . . . engaged in hostilities against the

United States or its coalition partners" under the Authorization for Use of Military Force

(AUMF).[3] *Barhoumi*, 609 F.3d at 420.

As the D.C. Circuit noted on appeal, Mr. Barhoumi does not challenge the AUMF

detention standard, under which which the President is authorized "to detain persons who were

part of[,] or substantially supported, Taliban or al Qaida forces or associated forces that are

engaged in hostilities against the United States or its coalition partners . . . ." *Barhoumi*, 609

F.3d at 423. Nor does Mr. Barhoumi contest that the militia headed by Abu Zubaydah was so

---

[3] Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001) (reprinted at 50 U.S.C. § 1541 note).

SECRET//NO FORN                                    Page 3

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NO FORN~~

associated within the meaning of the AUMF. *Id.* "The only dispute, then, is whether Barhoumi

was, as the district court found, 'part of' Zubaydah's organization." *Id.* Both this Court and the

Circuit on appeal determined that the record demonstrated Mr. Barhoumi's participation by a

preponderance of the evidence. *Id.* at 422–23 (rejecting Mr. Barhoumi's argument that "a

standard of at least clear and convincing evidence" should apply because that argument is

"foreclosed by circuit precedent" (citing *Al-Bihani v. Obama*, 590 F.3d 866, 878 (D.C. Cir.

2010)).

      After canvassing all of the evidence, the D.C. Circuit focused on: Mr. Barhoumi's

own statement that he was "trained at the Khaldan camp, which was associated with Zubaydah;"

the statement to the Federal Bureau of Investigation by another detainee that Mr. Barhoumi was

"captured along with ███████ at the Faisalabad guesthouse;" and the statement in the diary of

Abu ████ al-Suri, which was recovered from the Faisalabad guesthouse, that Mr. Barhoumi was

a "Permanent" member of Mr. Zubaydah's militia (recorded under the name Ubaydah Al-Jaza'iri

(Ubaydah the Algerian) in the diary). *Id.* at 425–27.

      Mr. Barhoumi now challenges these conclusions on two separate bases: first, that

he was so harshly questioned at Guantánamo Bay in March and April of 2003 that none of his

later statements before the ARB or Combatant Status Review Tribunal ("CSRT") is reliable, *see*

Classified Mot. Relief ("R. 60 Mot.") [Dkt. 232]; and second, that the true author of the al-Suri

diary was a teenager named ████████ whose writings are, for various reasons, unreliable and

unrelated to Mr. Barhoumi. *See* Classified Mot. Supp. R. 60 Mot. [Dkt. 239].

~~SECRET//NO FORN~~                                                  Page 4

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NO FORN

## II. LEGAL STANDARD

Mr. Barhoumi argues that the final judgment against him should be vacated pursuant to Rule 60(b)(2) of the Federal Rules of Civil Procedure. Rule 60(b)(2) provides that "the court may relieve a party . . . from a final judgment, order, or proceeding" if the party presents "newly discovered evidence which by due diligence could not have been discovered in time for a new trial under Rule 59(b)." In order to receive relief under Rule 60(b)(2), a movant must demonstrate that "'(1) the newly discovered evidence [is] of facts that existed at the time of trial or other dispositive proceeding, (2) the [party seeking relief] must have been justifiably ignorant of [the evidence] despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.'" *Lightfoot v. District of Columbia*, 555 F. Supp. 2d 61, 66–68 (D.D.C. 2008) (quoting *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001)); *see also Manhattan Ctr. Studios, Inc. v. NLRB*, 452 F.3d 813, 817 (D.C. Cir. 2006). A motion under Rule 60(b)(2) "must be made . . . no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1). The moving party must show that the proffered evidence is "of such a material and controlling nature as will probably change the outcome." *In re Korean Airlines*, 156 F.R.D. 18, 22 (D.D.C. 1994).

The Court finds that Mr. Barhoumi presents "new evidence" previously unknown to his counsel and which existed at the time of the hearing on his habeas petition; that the unique circumstances of Guantanamo proceedings explain counsel's earlier lack of knowledge of the

SECRET//NO FORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NO FORN

interrogations of Mr. Barhoumi;[4] that the evidence of the interrogations of Mr. Barhoumi and the

alleged teenage author of the al-Suri diary would be admissible in a Guantánamo habeas

proceeding, although hearsay; and the evidence is not merely impeaching or cumulative, although

some of it is offered to impeach the provenance of the al-Suri diary. However, the Court cannot

agree that either type of evidence "probably would have changed the outcome." *Lightfoot*, 555 F.

Supp. 2d at 68.

### III. ANALYSIS

Mr. Barhoumi presents two kinds of newly-discovered evidence and argument:

first, in his Rule 60(b) Motion, that he was subjected to harsh interrogation during March and

April 2003 so that no reliance can be placed on his later testimony, and second, in the Motion to

Supplement, that the al-Suri diary was authored by a plagiarizing teenager and not an Abu

Zubaydah confidant, so it is not reliable. Both certainly require serious consideration and cannot

be ignored. With such consideration, however, it becomes evident that neither is of such import

to the question of Mr. Barhoumi's role in the Zubaydah militia as to have affected the outcome of

this case.

---

[4] As the government points out, Mr. Barhoumi himself was clearly in a position to inform his lawyers of the 2003 interrogation. Classified Gov't Opp. R. 60(b) Mot. [Dkt. 235] at 15–16. In this environment, however, the Court places no weight on that fact, even though Mr. Barhoumi is the Petitioner. Detainees at Guantánamo and their lawyers have great difficulty communicating, visiting, and, most of all, establishing mutual trust. Fearing other terrorist activity, the government has been slow and reluctant to share classified information. Mr. Barhoumi's counsel are working *pro bono* in the finest tradition of the legal profession and deserve the gratitude of the Court and the government. The Court will not fault client or counsel for lack of communication about interrogations that occurred two years before the petition was filed.

SECRET//NO FORN

SECRET//NO FORN

## A. Harsh Interrogation Techniques

In his Rule 60(b) Motion, filed with the Court Security Officer on August 27,

2010, Mr. Barhoumi sought relief from the judgment against him and for sanctions against the

government for its failure to disclose exculpatory evidence before judgment was entered. The

motion was based on "over 600 pages of recently disclosed documents describing, among other

things, the government's exceedingly harsh and inhumane treatment of [Mr.] Barhoumi at

Guantanamo." R. 60(b) Mot. at 1. The initial tranche of documents was released on June 29,

2010, 18 days after the Circuit's opinion was posted (although 78 days before the mandate was

issued) and nearly a year after the habeas hearing on Mr. Barhoumi's petition, "with no credible

explanation for the extraordinarily late date of disclosure." R. 60(b) Mot. at 2. The Government

produced additional classified documents on August 24, 2010. *Id.*

Mr. Barhoumi contends that his interrogations in March and April 2003 were

"severe, cruel, and dehumanizing." *Id.* at 3. He specifically notes that a high-ranking military

officer expressed concern that some aspects of the interrogation "'may have exceeded the scope'"

of instructions, particularly as it involved "'threats of transfer to a worse place or transfer to a

prison (where a detainee would be subjected to forced homosexual acts),'" which the officer

"'ma[d]e clear that [he] disapprove[d].'" *Id.* at 4 (quoting R. 60(b) Mot., Ex. 3 at 292 (26 May

2006 Memorandum from General Brantz Craddock, United States Southern Command)). Mr.

Barhoumi maintained silence during almost all of these interrogations, *id.* at 4, but he appeared to

be affected by the interrogation techniques through obvious signs of stress and agitation. *Id.*

SECRET//NO FORN

SECRET//NO FORN

The Court has reviewed all the Memoranda for Record (MFRs) that recount these

interrogations. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████ *See* R. 60(b) Mot., Ex. 1, at 5 (March 1, 2003 MFR).  Mr. Barhoumi had

earlier been questioned by the FBI and had answered some questions.  During the March-April

2003 questioning █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ R. 60(b) Mot.

at 4.  Counsel argue that this treatment in March and April 2003 "could have impacted his

statements during subsequent CSRT and ARB proceedings."  *Id.* at 5, *see also id.* ("Because the

Court relied extensively on Barhoumi's own statements . . . , the Court may have reached a

different decision in this case had the government produced these documents when Barhoumi's

habeas petition was pending.").  Counsel also argue that the "late-disclosed evidence, had it been

timely produced, may have had an impact on the ultimate outcome of this case."  *Id.* at 6.

---

[5] ████████████████████████████████████████████████████ R.
60(b) Mot., Ex. 1, at 27 (March 11, 2003 MFR).████

[6] *See, e.g.*, R. 60(b) Mot., Ex. 1, at 120 (April 25, 2003 MFR) ██████████
███████████████████████████████████████████████████████████████████████

SECRET//NO FORN                                        Page 8

SECRET//NO FORN

While the Court deplores the late production of these documents, *see* below, it

cannot agree with counsel's argument that earlier disclosure would have affected the legal and

factual conclusions in the case. It is clear Mr. Barhoumi appeared at times

R. 60(b) Mot., Ex. 2, at 7–9 (March 2, 2003 MFR);

*id.* at 18 (March 8, 2003 MFR);                                          *id.* at 66

(April 3, 2003 MFR).

*Id.* at 79 (April 7, 2003 MFR), 83 (April 8,

2003 MFR).

R. 60(b) Mot., Ex. 1 at 17 (March 5, 2003 MFR).

*E.g.*, *id.* at 18 (March 8, 2003 MFR).

when Mr. Barhoumi was left alone in the interrogation room with the interpreter, he engaged "in

a one hour two-way conversation" in which he advised the interpreter, among other things, that

SECRET//NO FORN                                          Page 9

SECRET//NO FORN

"the only reason he was talking now was to pass a message . . . that he would never talk
regardless of how bad his life gets" and that "being placed in isolation only serves to make him[ ]
. . . stronger against interrogation." *Id.* at 22 (March 9, 2003 MFR). ████████████ Mr.
Barhoumi again took the opportunity to talk to the interpreter when they were left alone, to
complain about the interrogators and their disrespect for his mother, as well as his need to pray.
*Id.* at 24–25 (March 10, 2003 MFR). When immediately given time to pray, Mr. Barhoumi told
his interrogator that "he is a good Muslim, and not a member of Al-Quada [sic]." *Id.* at 25.
Nonetheless, "he declined" to answer questions about his travel prior to capture. *Id.*

Mr. Barhoumi refused to talk *at all* during most of his interrogation sessions in the
period under scrutiny. He did speak to interrogators ████████████ but only to try to collect
information about the current situation in Iraq and the current disposition of Saddam Hussein.
Additionally, he complained about not being treated with respect." *Id.* at 108 (April 21, 2003
MFR). ████████████████████████████████████████
████████████████████████████████████████ *Id.* at 112
(April 22, 2003 MFR). ████████████████████████████
████████████ *Id.* at 114. ████████████████████
████████ *Id.* However ████████████████████████████
████████████ *Id.* at 115 (April 23, 2003 MFR) ████████████████
████████████████████████████

The personal strength of Mr. Barhoumi is evident. ████████████████
████████████████████████████████████ Obviously,

SECRET//NO FORN                                                     Page 10

SECRET//NO FORN

his statements to the FBI and others before the period of harsh interrogation are not affected by

the interrogation in 2003. Counsel offer no evidence that his later statements were affected,

either when testifying before the CSRT in September 2004, 17 months after the harsh

interrogations ended, or before the ARB in January 2008, 57 months afterwards. To the contrary,

the current record does not support a conclusion that Mr. Barhoumi's will was overborne by the

interrogation in March and April 2003, much less at any later time.[7] *See Anam v. Obama*, 696 F.

Supp. 2d 1, 5–7 (D.D.C. 2010) (in Guantánamo habeas proceeding, holding that confessions

made during confinement at Guantánamo were tainted by prisoner's "harsh treatment" during

earlier interrogations in Afghan prisons, including ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ Counsel's breathless argument that

"[t]here can be no question that the treatment detailed in the government's late-disclosed

evidence constitutes torture under various accepted definitions, and that it had a lasting effect on

---

[7] Mr. Barhoumi has knowledge of the impact of the March-April 2003 interrogation on his later statements, if any. Counsel's supposition that it "may have" affected his later testimony before the CSRT and ARB is insufficient to carry the point.

[8] This case is starkly different from *Anam* for three reasons. First, unlike *Anam*, there is no evidence that Mr. Barhoumi suffered "harsh interrogation techniques" before arriving at Guantánamo. *Anam*, 696 F. Supp. 2d at 7. Second, during the March–April 2003 interrogations, unlike the petitioner in *Anam* who confessed while being subject to interrogation, Mr. Barhoumi never confessed, remaining steadfast in his refusal to cooperate. The presence of the first coerced confession was key to the *Anam* court's finding that the later confession should be disregarded because "the interrogators at Guantánamo . . . reviewed Petitioner's coerced confessions from Afghanistan and asked him to make identical confessions." *Id.* Third, the nature of the interrogation of the petitioner in *Anam* ████████████████████████████ ██████████████████████████████████████

SECRET//NO FORN                                                    Page 11

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NO FORN

Barhoumi's mental and physical state," R. 60(b) Mot. Reply (notice of filing at [Dkt. 238]) at 2,

does not constitute evidence of its truth. Counsel's certainty of a "lasting effect" on Mr.

Barhoumi's psyche from interrupted sleep patterns and repetitive rounds of harsh questioning for

two months in 2003 is completely unsupported. The Court intimates no judgment about the

nature of the March–April 2003 questioning of Mr. Barhoumi, finding only that there is no

evidence that it affected his later statements to the CSRT and ARB. It provides no reason,

therefore, to reopen this matter.

### B. Delayed Release of Documentation

Counsel for Mr. Barhoumi also seek sanctions against the government pursuant to

Federal Rules of Civil Procedure 37(c)(1)(A) and (C) for its failure to produce these documents

on a timely basis when his petition was pending. *See* R. 60(b) Mot. at 8. Because counsel are

based in Denver, Colorado, and were required to make two unexpected trips to the secured

facility in Washington to review the documents and prepare their motion, they seek money

sanctions to pay for their trips and time. *Id.*

Government counsel argue that they fulfilled their obligations fully, regularly

supplementing discovery with arguably exculpatory evidence as the Amended Case Management

Order required and as such evidence was identified. *See* Gov't Opp. R. 60(b) Mot. at 5–8

(explaining history of production of documents in this case). The government notes that Mr.

Barhoumi did not seek any discovery relating to questioning in 2003 and never mentioned his

interrogation, so government counsel (located in the District of Columbia) did not seek any such

documentation from Guantanamo. Further, government counsel's review of materials for

SECRET//NO FORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NO FORN

exculpatory evidence relating to Mr. Barhoumi did not include review of materials assembled by

the Guantanamo Review Task Force pursuant to Executive Order 13,492, 74 Fed. Reg. 4897

(Jan. 22, 2009), because it was neither sought by Mr. Barhoumi nor ordered by the Court. Gov't

Opp. R. 60(b) Mot. at 6 (citing Decl. of Terry M. Henry, Assistant Branch Director, U.S. Dep't

of Justice, ¶¶ 5–9)). Only in the spring of 2010, when searching Task Force records for

information on Mr. Barhoumi because one or more of his interrogation statements was being

used in the case of *Alhag (ISN 686) v. Obama*, No. 05-cv-2199 (HHK), did government counsel

discover the instant MFRs and other documents concerning his interrogation. *Id.* at 7. They then

sought authorization to disclose these classified documents to Mr. Barhoumi's lawyers in June

2010 and, upon further searches and evaluation for classification, disclosed a second tranche of

documents in August 2010.

A Case Management Order was issued by the Court in all of the Guantanamo

cases in 2008, and it was adopted in this case as amended on December 16, 2008. *See* Amended

Case Management Order ("CMO"), [Dkt. 154]. The CMO ordered the government to disclose

all "reasonably available evidence," defined to mean "evidence contained in any information

reviewed by attorneys preparing factual returns for all detainees" as well as "any other evidence

the government discovers while litigating habeas corpus petitions filed by detainees at

Guantanamo Bay." *Id.* § I.D.1. The Court's careful definition recognized that the United States

could have information about the detainees spread across the world in various operations of war,

to which government lawyers on the habeas cases did not have access. However, all documents

on which the government relied to support detention or which it discovered during the litigation

SECRET//NO FORN

SECRET//NO FORN

of these habeas cases were ordered released so that both parties would have equal knowledge.[9]

The specific evidence at issue—MFRs on the interrogations of Mr. Barhoumi at Guantanamo in

2003 and the alleged teenage author of the al-Suri diary—was collected for purposes of the Task

Force appointed by President Obama in January 2009, well after Mr. Barhoumi's 2005 habeas

petition.  Despite the CMO, without a specific request from Mr. Barhoumi's lawyers or order

from this Court, government counsel did not search the Task Force data base to augment their

discovery in this case.

   This Court agrees with Mr. Barhoumi's lawyers that government counsel were

required by the terms of the CMO to search for, locate, and produce the documents in question

once they were gathered for purposes of the Task Force.  The documents should have been

disclosed earlier.  The defense that Mr. Barhoumi's lawyers did not specifically request and the

Court did not specifically order such disclosure in this case is unavailing.  The Task Force was

convened under the auspices of the Attorney General, ultimate supervisor of government counsel

here, and information known to it could not be ignored as "not reasonably available" to these

Department of Justice counsel.  *See* Executive Order 13492, 74 Fed. Reg. at 4898 ("[T]he

Attorney General . . . shall coordinate the Review . . . .").  Thus, the Court agrees with Mr.

Barhoumi's counsel that a violation of the CMO occurred.

---

[9] The CMO recognized that certain circumstances could arise in which the information to
be disclosed to petitioner's counsel was classified and the government objected to disclosure.
CMO § 1.F.  There is no such issue here. *See Mousovi v. Obama*, No. 05-1124, 2013 WL 97355,
at *4–5 (D.D.C. Jan. 9, 2013) (discussing *Al Odah v. United States*, 559 F.3d 539 (D.C. Cir.
2009) and concluding that Top Secret material need not be disclosed to a petitioner's counsel
even if relevant despite the fact that the Court could review it).

SECRET//NO FORN      Page 14

SECRET//NO FORN

Even so, the Court finds that no sanction is appropriate. Even assuming *arguendo*

that the discovery provisions of the Federal Rules provide authority for sanctions in Guantánamo

habeas proceedings, justice does not require entry of any of the sanctions available under either

Rule 37(b) or 37(c)(1).[10]  *See* Fed. R. Civ. P. 37(b)(2)(A) (providing that a Court "*may* issue

further just orders" upon a discovery violation (emphasis added)), Fed. R. Civ. P. 37(c)(1)(A)

(providing that for a failure to disclose a court "*may* order payment of . . . reasonable expenses"

(emphasis added)). "The central requirement of Rule 37 is that 'any sanction must be just.'"

*Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996) (quoting *Ins. Corp. v.*

*Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982)).  The law governing habeas

proceedings, including the disclosure requirements that were breached here, was too much in flux

to justify an award of sanctions. Whether Mr. Barhoumi even had the right to file this

proceeding was unsettled until *Boumediene* was decided in 2008, and the very discovery

provision requiring this disclosure, § 1.D.1, was changed between the original Case Management

Order issued by Judge Hogan on November 6, 2008, and the amended CMO. Under the original

order, the government arguably complied with its obligations. Moreover, the Henry Declaration

submitted by the government shows that Mr. Barhoumi's counsel received the first tranche of

---

[10] Mr. Barhoumi, relying primarily on Ninth Circuit precedent, asks the Court to find that
the government is not immune from an award of sanctions under Rule 37.  *See* R. 60(b) Mot.
Reply at 8.  Government counsel respond that Mr. Barhoumi's lawyers cannot collect money
damages from the United States, which enjoys sovereign immunity. *See, e.g.*, *FDIC v. Meyer*,
510 U.S. 471, 475 (1994) (absent a specific waiver, the United States government is protected
from suit by the doctrine of sovereign immunity); *see also Clark v. Library of Congress*, 750
F.2d 89, 103 (D.C. Cir. 1984) (sovereign immunity bars suits for money damages against public
officials sued in their official capacities absent a specific waiver).  Because the Court concludes
that sanctions are not appropriate, the Court does not reach Mr. Barhoumi's argument.

SECRET//NO FORN                                                Page 15

SECRET//NO FORN

materials within a month of DOJ counsel becoming aware of their existence. Henry Decl. ¶¶ 8,
10. In these circumstances, the Court finds that no purpose would be served by granting Mr.
Barhoumi's motion for sanctions.

### C. Author of "al-Suri Diary"

On review, the D.C. Circuit stated that "the central issue in this case" is whether
"the al-Suri diary is sufficiently reliable." *Barhoumi*, 609 F.3d at 424. "Applying the reliability
requirement set forth by this court in *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008), we
conclude that the district court did not clearly err in relying on the diary." *Id.* The Supplement to
Mr. Barhoumi's Rule 60(b) motion challenges directly the authorship of the al-Suri diary. The
Court will grant Mr. Barhoumi's motion for leave to file his Supplement to his Rule 60(b)
Motion and considers it in conjunction with his original motion under Rule 60(b).

"To begin with," Mr. Barhoumi "was captured along with Zubaydah at the
Faisalabad guesthouse, a fact he acknowledges. Barhoumi also acknowledges that he trained at
the Khaldan camp." *Barhoumi*, 609 F.3d at 425; *see also id.* ("[T]he government's assertion here
that Zubaydah ran the Khaldan camp is backed up by testimony from a self-professed Khaldan
trainee who, in proceedings having nothing to do with Barhoumi and which predated the
September 11, 2001, attacks, attested to Zubaydah's connection to Khaldan."). According to
Circuit precedent, these facts alone may be sufficient to warrant Mr. Barhoumi's detention. *Id.* at
425, 427.

Beyond these facts, the Circuit identified the last page of the al-Suri diary, listing
Mr. Barhoumi as a "Permanent" member of the Zubaydah forces, as "perhaps the most probative

SECRET//NO FORN                    Page 16

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NO FORN

record evidence that [Mr. Barhoumi] was in fact 'part of' Zubaydah's associated force." *Id.* at

425. In rejecting Mr. Barhoumi's challenge to the diary, the Circuit described it as "more than 65

pages of detailed observations recorded by a self-professed associate of both Zubaydah and

Barhoumi." *Id.* at 428. After evaluating the diary's "internal coherence as well as its consistency

with uncontested record evidence," the Court of Appeals "conclude[d] that the al-Suri diary

contains sufficient indicia of reliability to justify the district court's reliance on it." *Id.* In

reaching that conclusion, the D.C. Circuit rejected Mr. Barhoumi's attempt to analogize his case

to *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008), in which the Court found intelligence reports

"inherently unreliable." *Barhoumi*, 609 F.3d at 428–29 ("The al-Suri diary is therefore a far cry

from the 'bare assertions' deemed unreliable in *Parhat*, 532 F.3d at 847, as it possesses both

endogenous and exogenous indicia of reliability.").

In his Supplemental Motion, Mr. Barhoumi contends that "[t]he evidence

submitted in conjunction with this Motion is significant and calls into question the reliability of

the al-Suri diary." Mot. Supp. R. 60(b) Mot. ¶ 4. Comparing the past lack of information on the

identity of the diary's author, Mr. Barhoumi argues:

> Now, thanks to a recent government disclosure in another case, we do
> know who al-Suri is, and documents obtained from another case
> reveal that the al-Suri diary is nothing more than a combination of
> pages of a diary authored by a teenager named ███████, who
> included miscellaneous pages from the historical works of Sheik
> Abdullah Azzaz that describe Soviet/Afghani hostilities from years
> before the present war on terror even began.

SECRET//NO FORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NO FORN

*Id.* ¶ 9.[11]   Mr. Barhoumi's argument is based on the government's description of the author of the diary in a pleading filed in *Ali (ISN 685) v. Obama*, No. 10-cv-1020 (RJL), another Guantanamo habeas case, as "████ al-Suri, aka ████ Al-Suri." Mr. Barhoumi claims that ████ al-Suri, aka ████ Al-Suri, is the same person as ████, a teenager who allegedly kept a diary and included in it miscellaneous pages from the historical works of Sheik Abdullah Azzam.

At the outset, it bears noting that the authorship of the al-Suri diary is irrelevant to a large extent. Neither this Court nor the D.C. Circuit relied on the identity of Mr. al-Suri to find his diary persuasive. *See Barhoumi*, 609 F.3d at 429 ("[A]lthough it is true, as [Mr.] Barhoumi emphasizes, that the government has provided no information about al-Suri, the diary itself suggests that al-Suri possessed first-hand knowledge of Zubaydah and his organization."). It was the diary's "more than 65 pages of detailed observations" with "internal coherence [and] . . . its consistency with uncontested record evidence," that lent it authority. *Id.* at 428. Whether written by a man named al Suri or a man named ████, the diary itself carries the same hallmarks of credibility and reliability.

Recognizing this, Mr. Barhoumi's counsel attempt to transform the al-Suri diary into something entirely different. Relying primarily on analyses by unnamed persons working for detainee Abdal Razak Ali (ISN 685), Mr. Barhoumi's lawyers argue that a comparison between English translations of the al-Suri diary and Sheik Azzam's writings demonstrate that the former

---

[11] Mr. Barhoumi relies on the government's Amended Narrative Regarding Petitioner Abdal Razak Ali (ISN 685), which refers to "████ al-Suri, aka ████ Al-Suri." *Id.* ¶ 10.

SECRET//NO FORN                                      Page 18

SECRET//NO FORN

is, in large part, plagiarized from the latter. Although they cite 56 of the al-Suri diary's 63 pages

that allegedly "describe battles and individuals related to the Soviet invasion reflected in

Azzam's writings and books," Mot. Supp. R. 60(b) Mot. ¶ 17, counsel provide no expert analysis

or other support for their statement. Only in their Reply do counsel for Mr. Barhoumi offer a

chart that notes small similarities, such as: references to the name Abu Ubaida (or Ubaydah),[12] a

name admittedly used by Mr. Barhoumi and mentioned in the al-Suri diary, compared to

approximately the same name with different spellings in *The Signs of the Merciful in the Jihad of

the Afghan* and *The Lofty Mountain*, written by Sheik Azzam; a reference to "green birds" in the

al-Suri diary compared to "hearts of green birds" in *The Lofty Mountain*; a reference to "shining

lights from the graves of Arab martyrs in Qandahar" in the al-Suri diary compared to light

coming from "a Shaheed" and "Suraquah" in *The Lofty Mountain* and *The Signs of the Merciful

in the Jihad of the Afghan*, respectively; references in the al-Suri diary that "Taliban bodies do

not decay" and their blood remains hot after death compared to references in *The Signs of the

Merciful in the Jihad of the Afghan* to lack of rot in the bodies of martyrs and their fresh flowing

blood a year after death; plus similar, limited, comparisons. *See* Reply Mot. Supp. R. 60(b) Mot.

at 2–5.

---

[12] Abu Ubaydah was a kunya admittedly used by Mr. Barhoumi; the evidence indicates that he was also referred to as Shafiq.  A kunya is used to conceal true identities. *See generally* Decl. ▮▮▮▮▮▮▮▮▮▮▮"Names, Kunyas, Aliases and Variants" (Sept. 19, 2009) (exhibit to the Factual Return) at 2 (Redacted version available as Exhibit to Public Factual Return, [Dkt. 259-2] pages 39-51). "Because Arabic and English have several letters representing sounds that do not correspond directly, several letters or letter combinations are used to represent the same sound. For example, 'Noor' and 'Nur' are two variants of the same word. Additionally, 'Al,' 'Ul,' and 'Ur' are commonly interchanged, as are 'ul Din' and 'Uddin.'" Gov't Opp. Mot. Supp. R. 60(b) Mot. at 9 n.10 (citing ▮▮▮▮▮▮▮▮▮▮▮ Decl).

SECRET//NO FORN

SECRET//NO FORN

Assuming that this evidence should be considered at all, despite its tardy presentation in a Reply brief, it is not persuasive. The adoption of words, phrases and revelations from early holy works by devout followers writing later commonly demonstrates continuity of religious belief, not identical authorship. While it makes no finding, having insufficient Islamic scholarship and no access to the original writings in their original language(s), the Court concludes that the similarities among the three writings relied upon by Mr. Barhoumi do not carry his argument. They are certainly not sufficiently persuasive to say that they probably "would have changed the outcome" of the case. *Lightfoot*, 555 F. Supp. 2d at 66–68.

Further, however, Mr. Barhoumi cites interview reports that a teenager named ▮▮▮▮▮ was staying at the guesthouse in Faisalabad when Mr. Barhoumi and Mr. Zubaydah were apprehended there; that ▮▮▮▮▮ was most knowledgeable about computers among those at the guesthouse; and that ▮▮ ▮ ▮ was attempting to upload a book he had written about the life of Sheik Azzam. Mot. Supp. R. 60(b) Mot. ¶¶ 12–16, 19. Mr. Barhoumi contends that these facts demonstrate that the "▮▮ al-Suri, aka▮▮▮▮▮ Al-Suri"—identified by the government in *Ali v. Obama* as author of the al-Suri diary—is really ▮▮▮▮▮, whose written references to Abu Ubaida (or Ubaydah) in the al-Suri diary did not refer to Mr. Barhoumi.[13] *Id.* ¶¶ 10–12.

---

[13] Establishing ▮▮▮▮▮ as the diary's author supports Mr. Barhoumi's argument that he was not "part of" Zubaydah's forces because, according to Mr. Barhoumi, ▮▮▮▮▮ had not seen Zubaydah prior to March 2002 and thus "could not possibly have been a 'close associate' of Zubaydah at the time of the March 28, 2002 raid." Mot. Supp. R. 60(b) Mot. ¶ 19.

SECRET//NO FORN

SECRET//NO FORN

Counsel put too much weight on the name similarity when the real Arabic names contain sounds not readily translated into English and it is doubtful that many records contain persons' true names. *See* n. 12, *supra*. The instant record contains multiple similar names referencing obviously different persons who were staying in the Faisalabad guesthouse, undercutting Mr. Barhoumi's argument that the teenager ███████ must have been the author of the al-Suri diary. An FBI report, for example, reflects an interview of ████████████ a computer specialist. *See* Mot. Supp. R. 60(b) Mot., Ex. C at 1 (June 13, 2002 FBI FD-302 Report) ("██ advised that he had helped/taught others to use and set up email accounts on the computer.") The computer specialist ███ at times used the kunya ██████ and sustained gunshot wounds in the raid of the Faisalabad guesthouse, during which he was seized. *Id.* ████ ██████████ the computer specialist identified a photograph of ████████████ someone clearly other than himself, as '████████ from the Faisalabad safehouse." *Id.* at 4 (referencing photograph ██████

In another FBI interview, ████████████ the computer specialist—identified by the FBI as ██████████████████████ *see* Mot. Supp. R. 60(b) Mot., Ex. D (Investigative Report) at 1—said that he had been most knowledgeable about the computer among those at the Faisalabad guesthouse, *id.* at 20, and had been shot in the stomach and his right hand, *id.* at 26. ████████ also described ████████ arrival at the safehouse, using ████████ kunya, ██████ *Id.* at 16–17. ████████████ the computer specialist said that he had never seen ██████ before but that '████████████████ greeted ██████ as he arrived." *Id.* Notably, ████████████ the computer specialist also stated that

SECRET//NO FORN

Page 21

SECRET//NOFORN

Mr. Barhoumi, identified as Shafiq, greeted ▮▮▮ upon the latter's arrival at the guesthouse. *Id.*[14] ▮▮▮ the computer specialist further said that he had set up an email account at the Faisalabad safehouse for ▮▮▮ *Id.* at 20. When Pakistani police raided the safehouse, its occupants fled to the roof. *Id.* ▮▮▮ was among those on the rooftop where he saw ▮▮▮ with Mr. Barhoumi (identified as Shafiq). *Id.* at 25. Thus, based on the evidence Mr. Barhoumi himself has submitted, his preferred author, ▮▮▮ reported others of approximately the same name ▮▮▮ being at the same location at the same time.

Additional exhibits submitted by Mr. Barhoumi recount interviews with Ahmed Bin Kadr Labed (ISN 703), in which Mr. Labed referred to both ▮ the computer specialist ▮▮▮[5] and a second ▮ at the Faisalabad safehouse. *See* Mot. Supp. R. 60(b) Mot., Ex. G (Mar. 3, 2006 ISN 703 Report of Investigative Activity) (referencing ▮

[14] ▮▮▮, the computer specialist, indicated that he purchased various supplies for Mr. Barhoumi/Shafiq to train on and build remote controls. *Id.* at 21–24. Shafiq was training "Jubran" on electronics and was very secretive. *Id.* at 24, 28. Mr. Barhoumi's own Exhibit F, a report of an interview of ISN 696, indicates that "S[h]afiq, who had a deformed hand, was one of the trainers from the training camp at Faisalabad. Shafiq taught how to weld and fix electronic bombs." *See* Mot. Supp. R. 60(b) Mot., Ex. F (Aug. 8, 2002 Report of Investigative Activity of ISN 696).

[15] Mr. Labed "stated ▮ had a computer in his room, and was very knowledgeable about computers. Mr. Labed stated one of the projects[] ▮ was attempting was placing a book on the internet, which was written by Abdullah Azzam, so others could read it." *See* Mot. Supp. R. 60(b) Mot., Ex. G (Mar. 3, 2006 ISN 703 Report of Investigative Activity) at 3.

SECRET//NOFORN Page 22

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NO FORN

and Noor Uthman Muhammad, known as Samir), and *id.*, Ex. H[16] (Oct. 24, 2002 FBI FD-302

Report) ████████████████████████ Finally, the author of the al-Suri diary

himself referred in the third person to ████ as a computer specialist who had joined them

recently:

> Brother ████ Al-Din Al-((Muhtasab)) (he is the brother amongst the
> many who entered Afghanistan recently and since he is specialized in
> computers, he joined our group so that my friend [Zubaydah] could
> benefit from his expertise)[.]

Mot. Supp. R. 60(b) Mot., Ex. I (al-Suri Diary, ████████████ ) at 6. This particular ████

may or may not be ████████, who also was known as ████ and who had "recently" joined

them. *See* June 13, 2002 FBI FD-302 Report at 1; Mot. Supp. R. 60(b) Mot., Ex. E (Dep't of

Defense Intelligence Report) at 4 ("████ taught computer training at the safe house . . . known to

interviewers as ████████████████"); Mar. 3, 2006 ISN 703 Report of Investigative

Activity at 1–3; Oct. 24, 2002 FBI FD-302 Report at 6–7. The al-Suri diary names "████ Al-

Din Al-Muhtassib Al-Suri" as a permanent member of Abu Zubaydah's force, along with Abu

Kamil al-Suri ("Myself, Abu ████ al-Suri: Permanent") and Mr. Barhoumi ("Ubaydah al-

Jaza'iri: Permanent"). *See* al-Suri Diary at 67 (lines 2, 5 and 8).

---

[16] Interviewed on October 22 and 23, 2002, ████ said that ████ "was a 24 year old
Syrian who spoke English and sounded educated. He would teach some of the brothers about
using the computer. He told ████ that he resided in Saudi Arabia. He told ████, while
they were in Pakistani prison together, that he was going to receive $50,000 when he finished a
book he was writing about Sheik Azzam, the man who was Osama Bin Ladin's mentor." Mot.
Supp. R. 60(b) Mot., Ex. H (Oct. 24, 2002 FBI FD-302 Report) at 5–6.

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NO FORN

"The party seeking relief from judgment has an onerous standard to meet." *Int'l Bhd. of Teamsters*, 246 F.3d at 392. Not only must he present "new evidence," but he must show that his new evidence is so sufficiently material and important that the previous result, had the new evidence been known, would probably be changed. *Id.* Mr. Barhoumi argues that his new evidence suggests a different author of the al-Suri diary, but he fails to support his argument that the al-Suri diary is actually plagiarized from Sheik Azzam. He also fails to deal with the evidence of multiple persons with approximately similar names at the Faisalabad guesthouse at the time in question, or the fact that his proffered author of the al-Suri diary, ███████, himself reported on the presence of such similar persons, as did others in a variety of investigative reports and settings.

Confusion about a fact is not evidence that a contrary fact is more accurate. At best, Mr. Barhoumi has offered evidence that a young man known as ███ whose name might have been ████████, had knowledge of computers, was interested in Sheik Azzam, and stayed at the Faisalabad guest house when it was raided. Whether ████████ was *writing* a book about Sheik Azzam or merely trying to *upload* a copy of one of Sheik Azzam's books is unclear. *See* Mot. Supp. R. 60(b) Mot. ¶ 14 (arguing that Mr. Labed's statement "███ was attempting was placing [sic] a book on the internet, which was written by Abdullah Azzam, so others could read it," from the Mar. 3, 2006 ISN 703 Report of Investigative Activity at 3, shows "███ was . . . writing a book about Sheik Abdullah Azzam"). But nothing in the record suggests that ███ ████████ was keeping a diary and, as explained above, nothing in the commonality of small

SECRET//NO FORN

phrases used in the diary and used by Sheik Azzam demonstrate that the diary is actually

plagiarized from Sheik Azzam's books, as Mr. Barhoumi contends.

Mr. Barhoumi argues that his new evidence shows that much of the text of the al-

Suri diary comes from the writings of Sheik Azzam and refers to different times, places and

people and that the author of the al-Suri diary was really a young man with no attachment to Abu

Zubaydah or Mr. Barhoumi. His first challenge fails for lack of substantive support beyond

lawyer argument. His second challenge fails for want of persuasive evidence that it is more

likely true than not.

## IV. CONCLUSION

The movant under Rule 60(b)(2) must satisfy each part of a rigorous four-part test

to gain relief. *See Lightfoot*, 555 F. Supp. 2d at 66–68. This Court has studied Mr. Barhoumi's

briefs, exhibits and contentions at length. He has not shown that the evidence he presents now, if

available before, would probably have made a difference to the outcome of his petition for a writ

of habeas corpus. Accordingly, his motion will be denied. A memorializing Order will be

entered on the public docket, and this Opinion will be submitted to the Court Security Officer for

classification review.

DATE: June 5, 2013

                                  _____/s/_____
                                    ROSEMARY M. COLLYER
                                    United States District Judge